IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

DOYLE BYRNES,                        )
                                     )
              Plaintiff,             )   District Court
vs.                                  )   Case No.
                                     )   10-2690
JOHNSON COUNTY COMMUNITY             )
COLLEGE, DR. CLARISSA CRAIG,         )
MS. JEANNE WALSH, MS. AMBER          )
DELPHIA, DR. MARILYN                 )
RHINEHART and DR. DENNIS DAY,        )
                                     )
              Defendants.            )


TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

     On the 6th day of January, 2011, came on to be
heard proceedings in the above-entitled and numbered
cause before the HONORABLE ERIC F. MELGREN, Judge of the
United States District Court for the District of Kansas,
sitting in Kansas City, commencing at 1:30 p.m.
Proceedings recorded by mechanical stenography.
Transcript produced by computer.

APPEARANCES:

The plaintiff appeared by and through:
        Mr. Clifford A. Cohen
        Cohen, McNeile & Pappas, P.C.
        4601 College Boulevard
        Suite 200
        Leawood, Kansas  66211
The defendants appeared by and through:
        Mr. Mark A. Ferguson
        and
        Mr. Thomas E. Hammond
        Gates, Shields & Ferguson, P.A.
        10990 Quivira
        Suite 200
        Overland Park, Kansas 66210

<u>I N D E X</u>

WITNESSES                                                          PAGE

        <u>For the Plaintiff</u>
        <u>CHRYSTIE NORTH</u>
            Direct Examination by Mr. Cohen          20
            Cross-Examination by Mr. Ferguson        32
        <u>DANIELLE THOMPSON</u>
            Direct Examination by Mr. Cohen          50
            Cross-Examination by Mr. Ferguson        52
        <u>JAMIE VANDE BRAKE</u>
            Direct Examination by Mr. Cohen          58
            Cross-Examination by Mr. Ferguson        61
            Redirect Exam by Mr. Cohen               65
            Recross-Exam by Mr. Ferguson             66
        <u>DOYLE BYRNES</u>
            Direct Examination by Mr. Cohen          68
            Cross-Examination by Mr. Ferguson        85

        <u>For the Defendants</u>
        <u>AMBER DELPHIA</u>
            Direct Examination by Mr. Ferguson       106
            Cross-Examination by Mr. Cohen           114
            Redirect Exam by Mr. Ferguson            115
        <u>JEANNE WALSH</u>
            Direct Examination by Mr. Ferguson       116
            Cross-Examination by Mr. Cohen           127
            Redirect Exam by Mr. Ferguson            130
        <u>DR. DENNIS DAY</u>
            Direct Examination by Mr. Ferguson       131
        <u>DR. CLARISSA CRAIG</u>
            Direct Examination by Mr. Ferguson       135
            Cross-Examination by Mr. Cohen           138


EXHIBITS                                                          ADMD
<u>For the Plaintiff</u>
  No. 1 - Affidavit of Doyle Byrnes                     14
  No. 2 - JCCC Disciplinary Appeal 319.02               14
  No. 3 - Doyle Byrnes JCCC Transcript                  14
  No. 4 - Photograph of Doyle Byrnes with               14
  placenta
  No. 5 - 11-16-10 Letter, Walsh to Byrnes              14
  No. 6 - 11-17-10 Letter, Byrnes to Walsh              14
  No. 7 - 11-30-10 Letter, Walsh to Byrnes              14
  No. 8 - 12-2-10 Formal appeal letter to Dr.           14
  Craig
  No. 9 - 12-7-10 E-mail from Cohen to Dr. Craig        14
  No. 10 - 12-8-10 Letter, Dr. Craig to Byrnes          14
  No. 11 - 12-9-10 Letter, Cohen to Dr. Craig           14

No. 12 - 12-9-10 Letter, Dr. Craig to Byrnes          14
No. 13 - JCCC Nursing Code                            14
No. 14 - 11-15-10 E-mail from Karen LaMartina        105
to JCCC Nursing Students re. Cell Phones
No. 15 - 11-15-10 Transcript of Dr. Craig's          140
address to JCCC nursing students
No. 17 - JCCC Program Outlook for Nursing            142
No. 18 - Metropolitan CC Student Nurse Handbook      105
No. 19 - Estimated expense                           105


For the Defendants:
400 - 11-11-10 E-mail, Byrnes to Delphia             143
401 - 11-17-10 Letter, Byrnes to Walsh               143
402 - Color copy of photograph of Student No. 1      143
403 - Color copy of photograph of Student No. 2      143
404 - Color copy of photograph of Student No. 3      143
405 - Excerpts from JCCC Nursing Student             143
Handbook
406 - American Nursing Association Code for          143
Nurses and Code of Ethics
407 - Code of Conduct JCCC Nursing Program           143
408 - College Nurse Education/Kansas City Area       143
Nurse Executives (CNE/KCANE) Confidentiality
Statement
409 - Receipt of Nursing Student Handbook,           143
signed by Doyle Byrnes
410 - Affidavit of Amber Delphia                     143
411 - Syllabus and Statement of Clinical             143
Expectations (Maternal/newborn)
412 - Affidavid of Jeanne Walsh                      143
413 - Resume of Jeanne Walsh                         143
414 - Affidavid of Clarissa Craig                    143
415 - Report of Clinical Affiliate Agreements        143
for JCCC; Board of Trustees Agenda 4-29-10
416 - Clinical Affiliate Agreement between JCCC      143
and Olathe Medical Center
417 - Affidavit of Marilyn Rhinehart                 143
418 - Affidavit of Dennis Day                        143
419 - JCCC Student Code of Conduct, Policy No.       143
319.01
420 - JCCC Student Appeal of Disciplinary            143
Action, Policy No. 319.02
421- JCCC Student Academic Appeals, Policy No.       143
319.03
422 - JCCC Student Non-Academic Appeals, Policy      143
No. 319.04
423 - JCCC Rights and Privacy Act, Policy No.        143
319.06 (FERPA)
424 - 11-10-10 E-mail, Chrystie North to             143

Delphia
425 - 11-10-10 E-mail, Jamie Vande Brake to        143
Delphia


REPORTER'S CERTIFICATE                               159

1          THE CLERK:   All rise.  The United States District

2     Court for the District of Kansas is now in session, the

3     Honorable Eric F. Melgren now presiding.

4          THE COURT:  Good afternoon everyone.  You may be

5     seated.

6          I think we can turn this down, Stephanie.

7          We're here this afternoon in the case of Doyle

8     Byrnes versus Johnson County Community College, et al., Case

9     No. 10-2690.  Can I start with appearances from counsel.  And

10    why don't you kind of give me a sense of who's at various

11    counsel tables, since we seem to have full tables on both

12    sides.  Plaintiffs?

13          MR. COHEN:  Good afternoon, Your Honor.  I'm

14    Clifford Cohen, counsel for Doyle Byrnes.  Doyle, would you

15    please stand up.  This is Ms. Byrnes.  Across from me is my

16    paralegal Becky Keaton, and next to her an Allison Dodd, a KU

17    Law School student who's one of our clerks, and here is Austin

18    Hayden, an UMKC law student who's one of our clerks.

19          THE COURT:  All right.  Thank you, Mr. Cohen.

20          For defendants?

21          MR. FERGUSON:  Good afternoon, Your Honor.  Mark

22    Ferguson and my co-counsel Tom Hammond.  And with me today I

23    have the representative of Johnson County Community College --

24          THE COURT:  And show me which is who and who --

25          MR. FERGUSON:  I will.  I'm going to ask them to

1    stand up.

2                    THE COURT:  Who's Mr. Hammond?

3                    MR. FERGUSON:  Tom, please stand.

4                    (Mr. Hammond complies.)

5                    THE COURT:  All right.  Thank you, sir.

6                    MR. FERGUSON:  May I approach, Your Honor?

7                    THE COURT:  Oh, and counsel, I'll be relatively

8    informal in this hearing.  You don't need to ask permission to

9    approach.

10                    MR. FERGUSON:  I have an index of persons that

11   have their names and their titles.

12                    THE COURT:  Oh.

13                    MR. FERGUSON:  And the reason why that's important

14   also, Your Honor, is because we have a number of students that

15   will be mentioned throughout the proceedings today, and we've

16   created a legend, if you will, for students one through eight.

17   If those names are mentioned we just would prefer to protect

18   their confidentiality and use them by student number.  But the

19   first five people are listed here, and their titles, and

20   Dr. Terry Calaway, who is President of Johnson County Community

21   College, he's listed.  Next to him is Jeanne Walsh, and her

22   title is Academic Director of the Associate Degree Nursing

23   Program at Johnson County Community College.  And next to

24   Jeanne is Dr. Dennis Day, and he's Vice President of Student

25   Services at the college.  Next to Dr. Day is Dr. Clarissa

1   Craig.  She is Dean of the Health Care Professions & Wellness

2   Division.  Next to Dr. Craig is Dr. Marilyn Rhinehart, and

3   Dr. Rhinehart is the Executive Vice President for Academic

4   Affairs, and she's the chief academic officer for Johnson

5   County Community College.  And then last but not least is Amber

6   Delphia, the clinical instructor for the school of the nursing,

7   and these are clients represented through Dr. Calaway and the

8   other persons are parties in this lawsuit, Your Honor.

9                THE COURT:  All right.  Thank you, Mr. Ferguson.

10               Let me make a few -- I think we could probably

11   turn this down still a bit more, if we could.

12               Let me make a few introductory comments on how

13   we're going to proceed, and then this is plaintiff's motion so

14   we'll hear from it.

15               First of all, let me address, defendants, your

16   filing.  As you know, I indicated to you and my office

17   indicated to you a couple days ago that if you wanted me to

18   have an opportunity to review your filings, they'd need to be

19   filed before close of business yesterday because this morning

20   I'd be in travel status up here.  Although, obviously, I prefer

21   to have them a little before close of business, if I had them

22   by then I could have read them on the way up.

23               You notified my office yesterday that you

24   preferred to file it in perfect form rather than in a matter

25   where I would have time to read it.  That's one of the more

1   bizarre strategic choices I've encountered.  So you filed a

2   brief but not in a timely manner that I had any chance to

3   review it, because you chose to file it late rather than to

4   file it when the court could look at it.  I've taken about 20

5   minutes after I got here to look through it very quickly but

6   very quickly is all I've looked through it.  I don't know that

7   it will ever be read, counsel, frankly, because after this

8   hearing it becomes moot, so you should not assume that I'm

9   familiar with either the arguments or the exhibits in your

10  untimely filed brief, and you'll need to address those in oral

11  argument because I've simply not had time to look at them,

12  based on your untimely filing of them.

13          We have a motion to strike an exhibit.  I did look

14  at that very briefly.  I'm going to deny that motion.  I note

15  the great irony of your objecting to it because it was filed

16  too late for you to review, even though it was filed three days

17  ago and you filed over a hundred pages last night after 5:00.

18  That's certainly a nice degree of chutzpa.  I'm also denying a

19  motion to strike because you're concerned about student

20  privacy.  Ironically, although you have the obligation to

21  protect student privacy, for plaintiffs it's not a violation of

22  the Act for them to disclose that because they're not an

23  educational institution.  So I don't know, frankly, that that's

24  anything more than a tempest in a teapot because I don't know

25  that it will have much impact on what we're doing here today,

1  but I'm going to deny that motion to strike, after having

2  looked at those briefly.

3             I've allotted the afternoon for this hearing but

4  only the afternoon, so we need to be sure to conclude matters

5  by 5:00 o'clock.  I'm going to request counsel for both sides

6  to limit your evidentiary testimony on matters that are not

7  disputed.  It appears to me that a great deal of the facts

8  presented in this matter are not disputed.  A lot of them the

9  plaintiff has admitted to, not only in her filings but in the

10 letter to Johnson County.  Both of your factual statements, to

11 the extent I've briefly been able to peruse defendant's, appear

12 to be largely similar.

13            So to the extent it's necessary for predicate

14 purposes, I'm going to give you some leeway in the evidence

15 that you want to put on.  But let's not consume time

16 establishing facts that aren't disagreed.  And if necessary,

17 because I know this matter's recently filed, either of you can

18 inquire of the other party is there a dispute as to whatever,

19 and if there's not, I'll accept it as a stipulation and we can

20 go on.  I think that will be preferable.

21            The last thing I think I'll bring up at this point

22 prior to hearing argument and testimony is, as I understand the

23 rules, and I've had occasion to look at this in several other

24 situations, the principal difference between a temporary

25 restraining order and a preliminary injunction is the ex parte

1   nature of TROs, which is why the rules require them to be

2   short-lived.  When both parties -- well, obviously, the party

3   not seeking the restraining order has at least some notice to

4   be present and heard, I think the rules clearly envision in

5   that case that a preliminary injunction is appropriate.  And

6   so, obviously, I haven't made and don't know what kind of a

7   ruling I'm making, but I'm treating this as a preliminary

8   injunction hearing and not a temporary restraining order.

9        So to the extent that any order is issued -- and I

10  will rule from the bench because of the timely nature of this

11  dispute to not rule would be, in essence, to rule for the

12  defendant.  So if that's my position, I might as well do it.  I

13  will rule from the bench at the end of the day, but my ruling

14  will be, if I grant any sort of an injunction, in the nature of

15  a PI, not of a TRO, because obviously both sides are well

16  represented here.

17        Are there any other preliminary matters that we

18  need to take up before we proceed this afternoon?

19  Mr. Ferguson?

20        MR. FERGUSON:  Yes, Your Honor.  And if you'd

21  allow me to just explain, my apologies to the Court for not

22  getting that filed until late in the evening, we did our level

23  best.

24        THE COURT:  It would have been better to have

25  filed a B-minus brief that the Court could have reviewed and

1     looked at rather than an A-plus brief that will never be read,

2     counselor, but it's too late for apologies at this point.  I'd

3     rather move on with the hearing.

4              MR. HAMMOND:   Okay.  May we excuse any witnesses

5     the plaintiff intends to call from the courtroom, Your Honor?

6              THE COURT:  I think that at the request of counsel

7     I will invoke Rule 615.  Any witnesses that either party

8     intends to call I will exclude from the courtroom until after

9     they've testified, so that will apply for both sides.

10             You have counsel rooms outside.  I don't know --

11    Yolanda, are they unlocked?

12             COURTROOM DEPUTY:  Yes.

13             THE COURT:  Have you all availed yourself of them

14    yet?  That's really not a counsel room.  That's for -- are you

15    using that for a counsel room?

16             COURTROOM DEPUTY:  We have an attorney room --

17             THE COURT:  But not this room right here.  No,

18    that's for criminal defendants in custody of the U.S. Marshals,

19    which won't be appropriate in this hearing.  We have -- outside

20    the double doors of the courtroom we have attorney rooms on

21    both sides.

22             And they are unlocked, Yolanda?

23             COURTROOM DEPUTY:  Yeah, the attorney rooms are.

24             THE COURT:  So if you all want to ask your

25    witnesses you anticipate testifying to wait in those rooms

1    outside of the courtroom and, therefore, there won't be much of

2    a delay, but I will grant the request under 615 to invoke

3    exclusion until witnesses testify.

4                    Any other preliminary matters?

5                    All right.  Mr. Cohen, this is your motion, so the

6    Court will recognize you.

7                    MR. COHEN:  Thank you, Your Honor.  First of all,

8    I want to express my appreciation to you, Judge Melgren, for

9    coming to Kansas City, Kansas, and for allowing us the

10   afternoon until 5:00 p.m.  I will keep an eye on my watch so

11   that I use only half of the time for my presentation.

12                   THE COURT:  You probably will need time for

13   arguments, too, because I anticipate that that will be the

14   larger part of what we need to do.

15                   MR. COHEN:  Yes, good point.

16                   Plaintiff has filed her motion for preliminary

17   injunction, her original suggestions, which I believe the Court

18   has reviewed, and some supplementary suggestions were filed

19   January 4th, which I hope the Court has reviewed.  In light of

20   the Court's comments, the reply brief I wrote this morning may

21   be moot.  It replies to matters filed at 9:30 last night.

22                   THE COURT:  I looked at it in the same rather

23   hastily cursory fashion that I looked through plaintiff's

24   40-page brief.  I have -- I mean, defendants' 40-page brief,

25   and I have looked through that very hurriedly as well as your

1    reply.  I've not at all looked at the exhibits you attached to

2    that.

3            MR. COHEN:  All right.  To expedite matters, the

4    Court has in front of it all of our exhibits, 1 through 19.

5    Sixteen is a compact disc and we're going to, hopefully, use

6    our copy to insert into the laptop here so the Court has a copy

7    on the bench.  Exhibits 1 through 13 were all previously filed

8    as exhibits to the complaint.

9            THE COURT:  Do you have an exhibit index for me,

10   Mr. Cohen?  I have copies of your exhibits, but if you have an

11   index, it would be very helpful.

12           MS. KEATON:  Here you go.

13           THE COURT:  Thank you so much.

14           MR. COHEN:  So with regard to Exhibits 1 through

15   13, those were all before the Court as attachments to the

16   original complaint or as an attachment to the supplemental

17   suggestions.  Opposing counsel has had a number of days'

18   opportunity to review those.  I don't see any benefit in having

19   each witness identify them.  They speak for themselves.  They

20   don't really require authentication, and I would like to at

21   this time offer Exhibits 1 to 13 in evidence.

22           THE COURT:  For purposes of this hearing?

23           MR. COHEN:  For purposes of this hearing.

24           THE COURT:  Other than relevancy and because this

25   is a hearing to the bench, I can assess relevancy as we go

 1   along.  Are there any other objections, Mr. Ferguson, to those

 2   exhibits?

 3              MR. FERGUSON:  I'm sorry, the ones that you

 4   offered were 1 through 13, or all of them?

 5              MR. COHEN:  Yes, at this time 1 through 13.

 6              THE COURT:  And those were all attached to your

 7   initial complaint?

 8              MR. COHEN:  1 through 12 were attached to the

 9   initial complaint.  Thirteen, the nursing code, was attached to

10   the supplemental suggestions.

11              THE COURT:  All right.

12              MR. FERGUSON:  No objection to Exhibits 1 through

13   13.

14              THE COURT:  All right.  Thank you.  They'll all be

15   admitted.

16              MR. COHEN:  Let me address very briefly my burden

17   of proof today.  On behalf of Doyle Byrnes, I intend to prove

18   that she will suffer irreparable injury unless the Court issues

19   the requested injunction; number two, that the threat and

20   injury outweighs whatever damage the proposed injunction may

21   cause the Johnson County Community College; number three, the

22   injunction, if issued, would not be adverse to the public

23   interest; and fourth, there is a substantial likelihood of

24   success on the merits.

25              I have tried in the briefing to cite Tenth Circuit

1    precedent.  And I won't make any further legal argument at this

2    point other than to mention one more time that in a case which

3    I would suggest is perhaps unique in Kansas, probably unique in

4    the Court's experience, there is a remarkably similar case

5    which I've submitted to the Court, the Yoder case, which I know

6    the Court has.

7                    THE COURT:  From western Kentucky?

8                    MR. COHEN:  From Western District of Kentucky.  So

9    without any further delay, I'd like to call my first witness

10   Chrystie North.

11                   THE COURT:  Can I ask you a question, counselor,

12   one question before you do that, because there's one point that

13   I'm not entirely clear that I'm clear on with respect to

14   plaintiff's position.  Your complaint itself states four causes

15   of action, but as to today's hearing is your only -- is the

16   only complaint you're advancing for purposes of this hearing

17   the denial of procedural due process, or are you seeking

18   injunctive relief on all four of the counts which you raise in

19   your underlying complaint?

20                   MR. COHEN:  Your Honor, I believe I've submitted

21   three counts:  Procedural due process, substantive due process,

22   and breach of contract.

23                   THE COURT:  You also have a -- you label it

24   misrepresentation.

25                   MR. COHEN:  Well, that's true.

 1              THE COURT:  It may be more of a fraud claim.

 2              MR. COHEN:  Yes.  You know, the tort of

 3    misrepresentation I think we could disregard today.  The

 4    contract claim the Court may want to take a look at because,

 5    obviously, Judge Simpson elected to disregard the

 6    constitutional (inaudible) --

 7              THE COURT:  (Inaudible) -- contract claim.

 8              MR. COHEN:  So we are proceeding on procedural due

 9    process, substantive due process, and breach of contract.

10              THE COURT:  All right.  Thank you.  You can

11    proceed.

12              MR. COHEN:  All right.  Chrystie North, would you

13    come up and be sworn.

14              MR. FERGUSON:  Your Honor, will you permit counsel

15    to respond or wait until --

16              THE COURT:  Respond as to what his claimed

17    position is?

18              MR. FERGUSON:  Opening statement of his position.

19              THE COURT:  I guess if you'd like to make a

20    response at this time, I'll permit it.

21              You're standing there awkwardly, aren't you?  Why

22    don't you take a seat there.  I'll listen to Mr. Ferguson and

23    then I'll swear you in.  And you should -- Yolanda, can we get

24    some water for our witnesses?

25              COURTROOM DEPUTY:  There's water.

1          THE COURT:  There is?  I just can't see it in my

2     line of vision.

3          Go ahead, Mr. Ferguson.

4          MR. FERGUSON:  Thank you, Your Honor.  I'd like to

5     put the issue in context since you have the brief but I'd like

6     to address a couple of the high points, if you don't mind.  The

7     basis for the dismissal of Doyle Byrnes was as stated in the

8     letter from Ms. Walsh, was that her demeanor and lack of

9     professional behavior surrendering the event, the posting of

10    the pictures and the related commentary on the web, was

11    considered a disruption to the learning environment and did not

12    exemplify the professional behavior that is expected in the

13    nursing program and it is our position that the procedural due

14    process, substantive due process, have been met, and that if

15    you look at the chronology of events presented through the

16    statements of facts, the clinical pictures were presented on

17    November 10th, there was a meeting with Walsh on November 11th.

18          On November 16th there was a letter from Walsh to

19    Byrnes which outlined her position.  Ms. Walsh received a

20    letter from Byrnes on the 17th, which stated her apology and

21    acknowledged her wrongdoing, there were further discussions

22    between Walsh and Byrnes.  On November 22nd there was notice

23    and opportunity to be heard.  There were consideration of the

24    options that were alternative to a dismissal from the program,

25    and an explanation that Ms. Walsh would support readmission in

1   the fall.  On November 30th there was a letter from Walsh to

2   Byrnes.  And these are the exhibits that have been submitted by

3   plaintiff's counsel, the formal notice.

4           Mr. Cohen attended the next step in the appeal

5   process, which was the -- the appeal to Clarissa Craig, and

6   that was on December 2nd.  He submits -- excuse me, the meeting

7   was on December 8, but he submitted a detailed position

8   statement on December 2nd.  On December 8th there was a letter,

9   extension and deliberation, which Dr. Craig sent to the

10  plaintiff, indicating that she was continuing to consider the

11  facts in the matter.  On December 9th Mr. Cohen submitted

12  extensive supplemental documentation, his argument, his letter

13  of appeal, including other suggestions and demands.

14          On December 16th there was a letter that was sent

15  from Dr. Craig to Byrnes indicating the basis for the decision.

16  And then ultimately Doyle Byrnes received notification in her

17  home on December 18th, a written position statement, and that

18  on December 23rd this lawsuit was filed without Ms. Byrnes'

19  completing the final step in the appeal process that was

20  offered by the college.  We believe that this is more than

21  adequate notice and opportunity to be heard as is required of

22  the due process.

23          These policies, the policies that were violated,

24  are presented to the Court in the exhibit notebook and the

25  exhibits that we've attached.  We'd ask the Court to review

1    policy number -- or, excuse me, Exhibit No. 405, which is the

2    Nursing Student Handbook, and in that, those excerpts from the

3    student handbook there's a code of conduct, there's a promotion

4    policy, there's a student grievance procedures, there's a

5    patient confidentiality, there's a statement regarding use of

6    communication devices, the ANA code of ethics for nurses is

7    referred to; and then Exhibit 408 there's a confidentiality

8    statement.  All of those are clear notice as to what was

9    expected of Ms. Byrnes in the nursing program.

10              What the -- I'd like to call the Court's attention

11   and respond on the Yoder matter because that was, in fact, a

12   decision on the merits.  It was a motion for --

13              THE COURT:  Are we past opening statement into

14   argument here, Mr. Ferguson?

15              MR. FERGUSON:  Yes, Your Honor.

16              THE COURT:  Mr. Cohen, would you -- I'm nervous

17   about the fire marshal.  Would you object to impanelling a jury

18   and moving some of our audience into these seats?  I don't know

19   if you have any confidential things that they could see over

20   your shoulders on --

21              MR. COHEN:  What I have is all over the Internet

22   now, there's nothing --

23              THE COURT:  Well, perhaps some are friendly for

24   you.  But we have people sort of standing around.  Yolanda, can

25   you sort of help me impanel a jury here, who will not get to

1   deliberate, but to at least sort of relieve some seating crunch

2   here if we could, if you all don't mind.

3            And I had the feeling while you were up here you

4   lost your seat out there.  Thanks, Yolanda.

5            All right.  Well to the extent we get a bigger

6   crowd, I'll conscript some people.

7            All right, ma'am, would you stand and the deputy

8   clerk will swear you in for your testimony here.

9                          CHRYSTIE NORTH,

10  having been first duly sworn to testify the truth, the whole

11  truth, and nothing but the truth, testified as follows:

12                     DIRECT EXAMINATION

13  BY MR. COHEN:

14     Q.  State your name, please.

15     **A.  Chrystie North.**

16     Q.  And are you a resident of Johnson County, Kansas?

17     **A.  Yes.**

18     Q.  What was your educational status on November 10th,

19  2010?

20     **A.  A student, a nursing student at Johnson County**

21  **Community College.**

22     Q.  And would you move the microphone closer to you.  Thank

23  you.

24            And on that date what was your expected date of

25  graduation?

1-6-11 BYRNES v. JCCC, et al.  10-2690

21

1    A.    May of 2011.

2    Q.    And what degree did you expect to receive?

3    A.    The two-year R.N.

4    Q.    With that degree would you be eligible for a registered

5    nurse license?

6    A.    Yes.

7    Q.    And what salary expectation did you have upon

8    graduation?

9    A.    Forty-five, 50,000.

10   Q.    Directing your attention to the events of

11   November 10th, 2010, what course work were you involved in that

12   day?

13   A.    We were in our OB clinical course.

14   Q.    And generally tell the Court what an OB clinical course

15   is all about.

16   A.    It's essentially labor and delivery, mommy/baby nursing

17   or nursery, working with the new moms, delivering babies.

18   Q.    And what was the time of day scheduled for that clinic?

19   A.    7:00 a.m. to 3:00 p.m.

20   Q.    Who was the instructor?

21   A.    Amber Delphia.

22   Q.    And do you see her in the courtroom?

23   A.    Yes.  She's behind you.

24   Q.    What was her title, to your knowledge?

25   A.    She's also an R.N. and clinical instructor.

1     Q.   All right.  And as you understand it, what were her

2  responsibilities with regard to you and the other nursing

3  students in her clinic?

4     **A.   To be supervisor and to guide us.**

5     Q.   Prior to November 10th, had she supervised you and

6  guided you?

7     **A.   Yes.**

8     Q.   Did you know, prior to November 10th, what you would be

9  taking up that day in clinic?

10    **A.   Whether or not we'd be examining a placenta?  No.**

11    Q.   What did you think you'd be doing?

12    **A.   We had -- we were all individually assigned different**

13 **areas within the clinical that we knew in advance.**

14    Q.   And what was your assignment?

15    **A.   I was in mother/baby that day.**

16    Q.   Did you indeed examine a placenta that day?

17    **A.   Yes.**

18    Q.   Prior to that examination, had you spoken with

19 Ms. Delphia about the desire to examine a placenta?

20    **A.   Yes, I was very excited.  I asked her if we could do**

21 **it, if we could examine a placenta, 'cause some of the other**

22 **clinical groups had been able to do the same.**

23    Q.   And when did that conversation occur?

24    **A.   It was -- I don't know the exact time.  It was before**

25 **lunch.  We were discussing being able to get a placenta or not.**

1    Q.   And very briefly, what is a placenta?

2         THE COURT:  I know what a placenta is.

3         MR. COHEN:  All right.

4    BY MR. COHEN:

5    Q.   What did Ms. Delphia say to you that morning about

6    examining a placenta?

7    **A.   She was willing to try and see what she could do about**

8    **getting you a placenta.  She said she needed to call the school**

9    **or someone to be sure that it was something we were allowed to**

10   **do.**

11   Q.   And do you know whether she called the school?

12   **A.   I believe she used her cell phone and called somebody**

13   **from the school to verify.**

14   Q.   And so what was the scene visually when she brought in

15   the placenta?

16   **A.   It was in a dirty utility room, a very small**

17   **closet-like space.  We were all within arm's reach of each**

18   **other.  It was sitting in a tub on the counter.**

19   Q.   And how many people were in the dirty utility room at

20   that time?

21   **A.   I don't believe that the whole group went in at the**

22   **same time, but there were probably five or six of us in that,**

23   **all gathered around with Amber and the other two did come in.**

24   Q.   And do you have an understanding in terms of feet of

25   the length and width of the room?

1          THE COURT:  Compare it to the jury box, if that

2    helps.

3          THE WITNESS:  It was smaller than the jury box.

4    It was maybe half that, like 8 by 10 feet, 8 feet by 10 feet

5    maybe.  We were all within arm's reach of each other.

6    BY MR. COHEN:

7    Q.  Did you know whose placenta you were examining?

8    **A.  No.**

9    Q.  What instruction did Amber Delphia give to you upon

10   presenting the placenta?

11   **A.  She didn't really give instructions.  She just let us**

12   **put on gloves and examine it.**

13   Q.  And did you personally examine it?

14   **A.  Yes.**

15   Q.  Did you touch it?

16   **A.  Yes.**

17   Q.  Was Ms. Delphia observing you?

18   **A.  Yes.**

19   Q.  Who brought up the request to photograph the placenta

20   with a particular student in each of the photographs?

21   **A.  I did.**

22   Q.  And did you use your cell phone?

23   **A.  Yes.**

24   Q.  And tell the Court how you brought that request up to

25   Ms. Delphia.

1      A.   I believe that she was out of the room for a minute,

2  then the girls and I discussed whether or not we should ask

3  permission to take a picture or to ask if we could take a

4  picture.  She came back in and we asked her, and, you know, we

5  had, amongst ourselves, concluded that it wasn't a HIPAA

6  violation.  She came into the room and I asked her, "Can we

7  take a picture?"  And there were some patient stickers off to

8  the side on the counter next to the tub, and she pointed that

9  out and we moved them, and we said, "Okay?"  And she said,

10 "Okay."

11              MR. COHEN:  And, Judge, at this point I might

12 comment that the brief and exhibits filed last night by the

13 defendants concede the point that I'm making here, that the

14 photos were taken with permission.  I don't think that's a

15 disputed issue.

16              THE COURT:  My impression again from only very

17 cursory view of defendant's brief, is that they acknowledge

18 that Ms. Delphia -- is it Ms. Delphia (pronouncing) -- gave

19 permission to take photos but denied that she knew that they

20 intended to post them on Facebook.

21              MR. COHEN:  And I agree that that's their

22 position.

23              THE COURT:  All right.

24              MR. COHEN:  But with regard to any further

25 evidence on the consent to take the photos, I think that's now

1   evident that they have, if not formally stipulated --

2           THE COURT:  I think that's stipulated.  I think

3   you can proceed.

4           MR. COHEN:  All right.  Thank you.

5   BY MR. COHEN:

6   Q.  Who had their picture taken?

7   **A.  I did, Jamie did.**

8   Q.  Give a full name.

9   **A.  Jamie Vande Brake, Danielle Thompson, Doyle Byrnes, and**

10  **Lena Ekstrom, I believe is her last name.**

11  Q.  And were there some other students whose pictures were

12  taken?

13  **A.  There were three other students, but they did not have**

14  **their picture taken.**

15  Q.  Oh, I see.  They were present, but they didn't have

16  their pictures taken?

17  **A.  Right.**

18  Q.  And what was Ms. Delphia doing while you were taking

19  pictures?

20  **A.  I honestly can't remember.  I don't know if she was**

21  **standing right there or if they left the room.**

22  Q.  Did the subject of these photographs come up again

23  during that day's clinical experience?

24  **A.  Right after we had examined the placenta we went into**

25  **the locker room to get ready for post conference, and it came**

1    up again in the locker room.

2        Q.   And why would you all have been in the locker room?

3        A.   We were getting our belongings.

4        Q.   And is it customary for the instructor to go in the

5    locker room with you?

6        A.   Sure.  She would keep her stuff in there, too.

7        Q.   All right.  And did Ms. Delphia say something to you

8    about the photographs in the locker room?

9        A.   She did.

10       Q.   Tell the Court what she said.

11       A.   She asked me -- well, she specifically said, "You

12   aren't sending those pictures to people, are you?"  And I said,

13   "No.  I'm putting them on Facebook."  And she said, "Oh, you

14   girls."  And, you know, she acted like she understood what was

15   happening.

16       Q.   And did you -- well, I don't want to put words in your

17   mouth.  What did you believe was the message you were getting?

18       A.   I -- I mean, she didn't say one way or the other, but

19   it seemed like it was okay with her.

20       Q.   Did she speak to you later that day about the photos?

21       A.   At 7:30 that night I got a phone call, and she asked me

22   if it was still up on Facebook and to please take it down.

23       Q.   And what did you say to her?

24       A.   I asked her if we were in trouble, and she said she

25   didn't know.  I took it down immediately.

1    Q.   Did she tell you what prompted her to request that the

2    photos be removed?

3    **A.   She said she was getting phone calls and e-mails from**

4    **the school.**

5    Q.   Were you dismissed from the nursing program at Johnson

6    County Community College as a result of having posted your

7    photo to Facebook?

8    **A.   Yes.**

9    Q.   And tell me how that occurred.

10   **A.   The next morning on the 11th I got a call at**

11   **10:00 o'clock from Gale Cummings, the secretary.  She wanted me**

12   **to come in and meet with Jeanne that afternoon, so --**

13   Q.   Jeanne who?

14   **A.   Walsh.**

15   Q.   And who is Jeanne Walsh?

16   **A.   The director of nursing.**

17   Q.   All right, go ahead.

18   **A.   And so I went in, and the four of us were called in**

19   **together to meet with her at the same time, and we waited**

20   **outside on the bench till we were called, and we went in and**

21   **that's when it took place.**

22   Q.   I want you to give the Court a feel for what occurred

23   in the meeting with Jeanne Walsh, but before you do that let's

24   be clear.  By the time you left that meeting, had you been

25   dismissed?

1    A.   Yes.

2    Q.   All right.  So what did Jeanne Walsh say to you and

3  what did you say to her?

4    A.   We went in and we were all four sitting there.  It was

5  Jeanne Walsh and Karen LaMartina, who is also a nursing

6  instructor.  It was very quiet, and you could tell that Jeanne

7  Walsh was very upset, and she looked at each one of us and said

8  that she hoped that she could control her anger, and then she

9  asked if we knew why we were there, and we said yes, and 'cause

10  we'd gotten the phone call to take the pictures down.  Then she

11  asked what we -- she said, "What were you girls thinking?"

12  And, you know, it was -- I was very emotional.  Doyle did most

13  of the talking.  She said that it was the most -- it was the

14  biggest disappointment that she had, you know, experienced in

15  her lifetime.  "How can you do this to me or my kids?"

16        When we got to the point of -- I think Jamie said we

17  had permission to take the picture, and not to throw our

18  instructor under the bus.

19    Q.   Excuse me, who made that statement about not throwing

20  your instructor under the bus?

21    A.   Karen LaMartina.

22    Q.   And did she do that in the presence of Jeanne Walsh?

23    A.   Yes.

24              THE COURT:  I'm sorry, who made that statement?

25              THE WITNESS:  Karen LaMartina.

1          THE COURT:  Who is she?

2          THE WITNESS:  She's a clinical instructor.

3          THE COURT:  Is she on this list?

4          MR. FERGUSON:  No.

5          THE COURT:  Okay.

6  BY MR. COHEN:

7     Q.   But when you arrived that morning, was she present?

8     **A.   Yes.**

9     Q.   And to the best of your knowledge, what is her function

10  with regard to Ms. Walsh as director of nursing?

11    **A.   She's a pediatric nursing instructor at the school.**

12    Q.   A moment ago you referred to Ms. Walsh stating that she

13  hoped she could control her anger.  Did she appear to control

14  her anger?

15    **A.   She was very emotional.  She was very, very upset.  She**

16  **yelled and she cried, and it was just lots of emotion.**

17    Q.   Did you have a full opportunity to explain your defense

18  that you believed you had consent of Ms. Delphia?

19    **A.   No.**

20    Q.   Did you try to explain that?

21    **A.   Jamie tried to say something, and then as soon as Karen**

22  **LaMartina suggested that we were throwing our instructor under**

23  **the bus, we dropped that subject.**

24    Q.   Were you told what rule of Johnson County Community

25  College you violated?

1     **A.   She said that we had violated the student code of**

2     **conduct and that if we wanted to find out further about that we**

3     **needed to go speak with Dennis Day.**

4     Q.   Is the student code of conduct that she referred to the

5     same thing as the nursing school code of conduct?

6     **A.   No.  They're two different things.**

7     Q.   Did you later receive a letter telling you that your

8     dismissal would remain in force because you had violated the

9     nursing school code of conduct?

10    **A.   Yes.**

11    Q.   But when you were dismissed, you were not told about

12    having violated the nursing school code of conduct?

13    **A.   No, it was the student code of conduct.**

14    Q.   Had you ever met Ms. Walsh before that encounter?

15    **A.   No, that was my first interaction with her, being**

16    **dismissed.**

17         MR. COHEN:  I think I'm going to stop at that

18    point and let Mr. Ferguson cross-examine you.

19         THE COURT:  Thank you, counsel.

20         Mr. Ferguson.

21         MR. FERGUSON:  Your Honor, I have some exhibits

22    that I want her to look at.  Do you want me to identify them

23    before we publish or do you want her to look at these?

24         THE COURT:  Well, there's no jury.  You'll only

25    publish them to me.

```
 1                        CROSS-EXAMINATION
 2    BY MR. FERGUSON:
 3       Q.  I show you what's been marked as Defendant's
 4    Exhibit 404.  Is that the picture that you took?
 5       A.  Well, I didn't take that picture, but I'm in the
 6    picture, yes.
 7       Q.  And that's the picture on your cell phone camera?
 8       A.  Yes.
 9       Q.  What did you do with that picture?  Is it still on your
10    cell phone?
11       A.  Not right now, no.
12       Q.  You deleted it?
13       A.  Uh-huh.
14       Q.  Is that a "yes"?
15       A.  Yes.
16       Q.  Why'd you delete it?
17       A.  I delete all the pictures off my phone.
18       Q.  How many pictures in total were on your phone?
19       A.  All kinds of pictures?
20       Q.  No, I mean, that related to the incident on
21    December 10th.
22       A.  Five.
23       Q.  Five pictures, okay.  And did you post that picture on
24    the Facebook?
25       A.  I did.
```

1    Q.   And did you have any comments along with it?

2    A.   Yes.

3    Q.   What were the comments that you posted on Facebook?

4    A.   Oh, it was other people posting comments under the

5    picture.  I don't -- I can't remember.

6    Q.   Did you save those comments?

7    A.   No.

8    Q.   You deleted those?

9    A.   They delete -- they came off when I deleted the

10   picture.

11   Q.   Okay.  And so your posting of that picture on your

12   Facebook account allowed other people to see it and comment on

13   it and post whatever they wanted on your wall, on your Facebook

14   page?

15   A.   Only the people on my friends' list, yes.

16   Q.   Okay.  How many comments were received?

17   A.   Maybe ten.

18   Q.   But you didn't save those?

19   A.   No, when I deleted the picture they disappear with the

20   picture.

21   Q.   The picture, would you take a look at Exhibit No. 403,

22   which is in the notebook there.  Would you identify that for

23   the Court.

24   A.   Who it is?

25   Q.   Yes.

1      **A.    Danielle Thompson.**

2      Q.    And is that another copy of the picture that was on

3  your cell phone that was taken on November 10th?

4      **A.   Yes.**

5      Q.    And if you'll turn to Exhibit 402, would you identify

6  that.

7      **A.    Jamie Vande Brake.**

8      Q.    And is that also a -- one of the pictures that was

9  taken on your cell phone on November 10?

10     **A.   Yes.**

11     Q.    What were the other pictures?  One was of Leka (sic)

12  and one was of Doyle Byrnes, correct?

13     **A.    Lena and Doyle.**

14     Q.    Lena.   In the picture which is of Jamie Vande Brake,

15  can you see the Johnson County Community College emblem on her

16  smock or on her scrubs?

17     **A.   Yes.**

18     Q.    And it's clearly visible to you?

19     **A.   Yes.**

20     Q.    You realized on the evening of November 10th that you

21  had made a mistake, did you not?

22     **A.   When I got the phone call and was asked to take it**

23  **down?**

24     Q.    Yes.

25     **A.   I knew that there was going to be an issue with it,**

1   **yes.**

2      Q.   Okay.  What did you understand on November 10th at the

3   time you received the call?  What did you think the problem

4   was?

5      **A.   Well, when she called and asked us to take down the**

6   **picture off of Facebook, I thought that was a problem.**

7      Q.   And did you need further explanation at that time?

8      **A.   No.**

9      Q.   And as a result you sent Amber Delphia a note of

10  apology, did you not?

11     **A.   Yes, I did.**

12     Q.   I hand you what's been marked as Exhibit 424.  Is that

13  the e-mail apology?

14     **A.   Yes.**

15     Q.   Would you mind reading that to the Court, please.

16     **A.   "Amber, I've been thinking about this and I feel really**

17  **bad.  I'm not sure who else has posted pictures, but I did take**

18  **mine down.  I definitely didn't mean for you to get in any**

19  **trouble.  I wondered after posting the picture if it was a bad**

20  **idea.  I should have known better than to post anything on**

21  **Facebook, I guess, but I have tons of pictures of nursing**

22  **school events on my Facebook and didn't really think it was any**

23  **different.  It didn't violate HIPAA and I promise it was all in**

24  **fun.  I realize the school isn't happy, so what in your opinion**

25  **can I do to make things right?  I'm willing to apologize or do**

1    **whatever needs to be done, and I'm apologizing to you because**

2    **this wasn't your fault and I'm really sorry.  Please let me**

3    **know what I can do to resolve this." (As read.)**

4         Q.   So at 9:57 p.m. on Wednesday, December 10th, when you

5    were told to take it down, it was self-evident at that point to

6    you that this was a problem and that it was something that you

7    needed to apologize for?

8         **A.   I felt like I needed to apologize to Amber, yes.**

9         Q.   And was there more that you needed to know when you

10   wrote that e-mail?

11        **A.   What do you mean?**

12        Q.   Was there something that was left out or you knew this

13   was going to become an issue, as you talk about?

14        **A.   I knew it was going to become an issue.  I didn't know**

15   **how big of an issue, to what extent.**

16        Q.   Okay.  On the -- earlier in the day, Amber did not

17   provide you with permission to post it on the -- on the

18   Facebook account when you were in the dirty room or the soiled

19   room, right?  She didn't give you -- you didn't mention to her

20   that you were going to put this on Facebook?

21        **A.   Not in the dirty utility room.  In the locker room I**

22   **did mention it.  She knew that it was going on Facebook.**

23        Q.   And it's your testimony that you told her in the locker

24   room at that time what you intended to do with it?

25        **A.   Absolutely.**

1    Q.   And she didn't acknowledge one way or another, saying

2    yes, you can do it or no, you can't?

3    **A.   She just said, "Oh, you girls," and walked away.**

4    Q.   And so do you know what she knew about whether or not

5    you intended to post that on Facebook?

6    **A.   She knew that I was posting it on Facebook.**

7    Q.   You assume that she knew that?

8    **A.   It's not an assumption.  She asked me, she said,**

9    **"You're not going to send those to people, are you?"  And I**

10   **said, "No.  I'm putting them on Facebook."**

11   Q.   Who else was in the room, in the locker room at that

12   time?

13   **A.   Jamie Vande Brake, Danielle Thompson, all of the girls**

14   **were in there because we were all getting our things.**

15   Q.   You had a chance to meet the next day with Jeanne

16   Walsh, correct?

17   **A.   Yes.**

18   Q.   And you indicated that she was very emotional and that

19   she cried.  Did -- she specifically asked you, "What were you

20   girls thinking?"  Did you have an opportunity to answer her

21   questions at that time?

22   **A.   After a few minutes Danielle Thompson spoke up and**

23   **explained that we were excited and, you know, we wanted to**

24   **share our nursing experience with our friends and family.**

25   Q.   Okay.  Was there something else that you were

1  prohibited from sharing with her at that time that somebody

2  told you you couldn't explain your position; she left it

3  open-ended, right?

4      **A.  We were all very emotional at that time.  It -- nothing**

5  **was said that needed to be said at that time, nothing came out**

6  **that --**

7      Q.  You felt that when you met with Jeanne Walsh on

8  November 11th, even though you were emotional and maybe --

9  there was crying going on, you weren't told that you couldn't

10  speak, were you?

11      **A.  We were not told we couldn't speak.**

12      Q.  Okay.  And so any choice that you made at that point

13  not to tell part of the story would have been your own?  Did

14  she cut you off?

15      **A.  No, but she was very intimidating, and Karen LaMartina,**

16  **I mean, she was pretty much irate at the fact we did that.**

17      Q.  What do you know about the reputation of Jeanne Walsh?

18      **A.  She is -- she has a very good, high-standing**

19  **reputation.**

20      Q.  Do you know how long she's been in the teaching

21  profession?

22      **A.  I don't know the exact length of time.**

23      Q.  Is she highly regarded by other students and by other

24  nurses in the profession?

25      **A.  Yes.**

1   Q.   And does she -- are you aware that she's viewed as a

2   very compassionate and caring person?

3   **A.   I had never had any relations with her whatsoever until**

4   **that day.**

5   Q.   Okay.   And other than the fact that she was crying and

6   emotional, did she treat you with respect and talk with you

7   about the difficult -- and concerns that she had with you

8   posting that online?

9   **A.   I don't feel like it was respectful at all during that**

10   **meeting.   It wasn't at that meeting that respect was shown.**

11   Q.   On the 11th you -- were you discussed -- was it

12   discussed with you that there were possible options for

13   readmission or alteration of your grade to a W instead of an F?

14   **A.   I -- after she dismissed us, my immediate response was**

15   **to ask her could we reapply in the fall, and she said, "I don't**

16   **know if I want any of you back."   And I said, "So what can we**

17   **do?"   And then we were the -- the only information we had was**

18   **to be guided to Dr. Day or Mr. Day.**

19   Q.   Did she describe to you that one of the reasons why she

20   was not sure that you would be able to come back at that time

21   was because Olathe Medical Center might be concerned with you

22   coming back?

23   **A.   She didn't say during that meeting.**

24   Q.   Then you also sent a letter, a further detailed letter,

25   of apology to Ms. Walsh, right?

1     A.    Uh-huh.

2     Q.    And you sent that the following week?

3     A.    Yes.

4     Q.    You also expressed your regret for having made a

5  mistake and having a lapse of judgment for posting this on the

6  Internet, right?

7     A.    Right.

8     Q.    And did you get the opportunity at that time to fully

9  explain yourself and share with Ms. Walsh in more detail your

10 positions?

11    A.    I did feel like I got to explain better what my

12 thinking was.

13    Q.    Okay.  And she, as far as you know, she read that and

14 considered that in her decision-making process?

15    A.    As far as I know, yes.

16    Q.    And then you received notification at that point in

17 November, later in November, that the consideration or the

18 offer that was being made was that you would receive a W as a

19 grade rather than an F?

20    A.    Right.

21    Q.    And if you'd received an F, that would have been a

22 terminal event, wouldn't it, in terms of your education?

23    A.    Yes.

24    Q.    And did you feel like receiving a W was a concession or

25 some kind of a mitigation of the damage to your academic

1    record?

2       **A.   Somewhat, definitely.**

3       Q.   Okay.  You were advised that Ms. Walsh would support

4    your opportunity to be readmitted?

5       **A.   Yes.**

6       Q.   And what were the -- tell the Court what the terms of

7    that readmission was.

8       **A.   She was going to notify us sometime this month.   I**

9    **believe we were going to work a medical ethics project for her.**

10      Q.   And describe to the Court in a little more detail what

11   the medical ethics project involved.

12      **A.   I hadn't been given that information yet.   She was**

13   **going to let us know sometime this month.**

14      Q.   So it was specifically contemplated that as part of the

15   readmission you would have an extra project related to medical

16   ethics?

17      **A.   Yes.**

18      Q.   And that was going to be presented to you and discussed

19   here in January?

20      **A.   Yes.**

21      Q.   And did you then appeal Ms. Walsh's decision to

22   Dr. Craig?

23      **A.   Yes.**

24      Q.   And tell the judge what that process was like.

25      **A.   Well, we -- I wrote another letter of apology and**

1   explaining my reasons for why I did what I did, and then I went

2   in and had a meeting with her.

3      Q.   Okay.  Who else was present?

4      A.   It was just Clarissa Craig and I.

5      Q.   Did she listen to your explanation and your concerns?

6      A.   Yes.

7      Q.   And what was the outcome of that hearing?

8      A.   She was going to take -- I think it was she had a

9   weekend or something to think it over.  She was going to take

10  the time to think it over.

11     Q.   And did she offer at that time that she would assist in

12  getting you readmission to the program or into some other

13  program?

14     A.   Yes, into the R.N. program.

15     Q.   And what, if anything, did you do in response to her

16  decision?

17     A.   That was the end of my appeal.

18     Q.   You realize that you had an opportunity to further

19  appeal Dr. Craig's decision to Dr. Rhinehart, correct?

20     A.   Dennis Day advised us not to take that third appeal.

21     Q.   And tell me how he advised you not to take that.

22     A.   Well, he told us that it was -- he explained what --

23            THE COURT:  Who's "he"?

24            THE WITNESS:  Dennis Day.

25            THE COURT:  Okay.

1      A.   Explained to us what each individual appeal

2   incorporated, the first one, the second one and the third one.

3   And then he just figured -- what I got from him is that it

4   wasn't going to be in our benefit to go to the third step.

5      Q.   Let's back up.  After Dr. Walsh -- excuse me, after

6   Dr. Craig gave you the written determination where she

7   supported the recommendation of dismissal by Jeanne Walsh, did

8   you meet with Dr. Dennis Day?

9      A.   No.

10     Q.   Okay.  How did you get this information or this -- your

11  suggestion?

12     A.   We met with him prior to appealing to Dr. Craig.

13     Q.   Okay.  And he explained the academic appeals process to

14  you?

15     A.   No, not really.

16     Q.   All right.  If you'll turn to Exhibit No. 421.  Prior

17  to meeting with -- or do you recognize Exhibit 421, which is

18  the college's academic appeal process at 319.03?

19     A.   Yeah, but it was No. 9 that we were told to be

20  concerned with.

21          THE COURT:  I'm sorry, I couldn't hear you.

22  What'd you say?

23          THE WITNESS:  We were told to be concerned with

24  No. 9 of the student academic appeals process.

25  BY MR. FERGUSON:

1    Q.   You say No. 9?

2    **A.   Yeah.   It's not on here.**

3    Q.   Were you given a copy of the student academic appeals

4    process by Dr. Day?

5    **A.   Yes, he printed it out for us.**

6    Q.   Okay.   And did he offer to be a resource for you or an

7    advocate, to talk with you about the steps in the process?

8    **A.   Yes.**

9    Q.   Now, go back to this assertion that he told -- he

10   discouraged you from pursuing that appeal.   When did that

11   occur?

12   **A.   I don't know.   I can't remember exactly which day.   I**

13   **know we went in and talked to him prior to appealing to**

14   **Dr. Craig, and, you know, we wanted to get a list of the names**

15   **and the people we would talk to to appeal.**

16   Q.   Okay.   And at that time he told you that you would feel

17   Dr. --

18             MR. COHEN:   Your Honor, I'm going to object.   She

19   was cut off mid-answer.   I think she should be allowed to

20   complete her answer.

21             THE COURT:   If you weren't finished with your

22   answer, go ahead.

23   **A.   He -- he briefly described how the different appeals**

24   **worked.   And the third one would have, I guess, picked at the**

25   **individual process and if it was conducted correctly on kicking**

1  us out.  And he didn't think that that was something we needed

2  to do.

3  Q.  And who was present when this supposed conversation

4  happened?

5  A.  Jamie Vande Brake, Danielle Thompson and I were the

6  only ones in the room.

7  Q.  And you were at his office?

8  A.  Yes.

9  Q.  And he didn't tell you not to appeal, did he?  He

10  explained to you the process?

11  A.  He didn't tell us not to appeal, but he -- the

12  impression I was given was to not bother with a third appeal.

13  Q.  Okay.  So that was something that you -- that was your

14  impression, that was a conclusion that you drew from that; that

15  wasn't what Dennis Day told you?

16  A.  From what he said, that's the impression I got.

17  Q.  And you then didn't further appeal the decision of

18  Dr. Craig any further after you received her final notice?

19  A.  No.

20  Q.  What is your current status?  Have you submitted an

21  application for readmission?

22  A.  Yes.

23  Q.  And what is your understanding of the -- where that is

24  in the process?

25  A.  I haven't heard anything yet, but under -- I'm under

1    the impression that I will get some kind of e-mail or phone

2    call from the school to talk about the medical ethics project.

3        Q.   And that was a remediation -- that was a reintegration

4    project, something that you would talk about how medical

5    ethics -- that was a general understanding?

6        A.   It wasn't discussed at all.  I wasn't told what we were

7    going to do.

8        Q.   Okay.  Is the OB clinical rotation a prerequisite to

9    the rotations that you would have been expected to go into here

10   in the spring of 2011?

11       A.   I don't know that it's a prerequisite, but it comes

12   prior to management, yes.

13       Q.   Okay.  Your understanding of the nursing program, the

14   OB clinical is just offered in the fall only, correct?

15       A.   Correct.

16       Q.   So in the spring of 2011 there's not a clinical

17   rotation?

18       A.   Correct.

19       Q.   In the nursing program, are you encouraged and expected

20   to evaluate confidentiality?

21       A.   Yes.

22       Q.   And privacy of the patient?

23       A.   Yes.

24       Q.   And when you took the pictures on November 10th, did

25   you know that the patient was less than an hour having

1  delivered a birth by cesarean section?

2  MR. COHEN:  Judge, I'm going to object on

3  relevance since it's already been conceded that the photos were

4  taken with consent.

5  THE COURT:  Taken with Ms. Delphia's consent?

6  MR. COHEN:  Yes.

7  THE COURT:  Or with the patient's consent?

8  MR. COHEN:  Well, good point, Your Honor.  They

9  were taken with the school's consent.  I don't know about the

10  patient's consent.

11  THE COURT:  I'm going to overrule your objection.

12  MR. COHEN:  All right.

13  **A.  Okay, what was the question?**

14  Q.  The question was at the time you took the pictures on

15  November 10th, were you aware that this was a placenta of a

16  mother who had given a cesarean birth approximately an hour

17  prior to you taking the pictures?

18  **A.  That was the only placenta I've ever examined.  It**

19  **could have been any placenta.  It could have been one that they**

20  **had kept in the hospital for a while, 'cause they keep them.**

21  **So no, I don't know whose placenta it was.**

22  Q.  Well, there's a difference between what's referred to

23  as a fresh tissue --

24  THE COURT:  I think she answered your question,

25  counsel.

1     Q.   Okay.  What is the difference between a fresh placenta

2    and something that was frozen or something that was kept in

3    storage?

4        **A.   I wouldn't know 'cause that's the only one I've ever**

5    **examined.**

6     Q.   Okay.  But wasn't it part of the preconference

7    discussion that you were aware that a woman was giving a

8    cesarean birth as part of the reason why you asked to be able

9    to examine the fresh placenta?

10       **A.   No, it had nothing to do with the woman giving birth.**

11    Q.   In your mind it doesn't matter if that placenta came

12   from someone that was still in a hospital bed within the

13   hospital that you were working?

14       **A.   I'm sorry, what?**

15    Q.   In your mind, as you took that picture and posted that

16   on your Facebook, it didn't matter to you that the human organ,

17   the placenta, was of a patient that was still in a hospital bed

18   in the hospital?

19       **A.   I didn't know whose placenta it was, so that wasn't a**

20   **question in my mind.**

21    Q.   Knowing that now, does that make a difference to you?

22            THE COURT:  How's that relevant to this hearing?

23            MR. FERGUSON:  It goes to the issue of whether or

24   not she understood the patient sensitivity, whether or not she

25   had done something wrong.

 1                   THE COURT:  Well, but you've asked her four

 2    different times whether she knew that that was a fresh

 3    placenta, and she's told you no.  Since this relates to conduct

 4    that happened then, I don't think any of the rest of this is

 5    relevant, so let's move on.

 6                   MR. FERGUSON:  Okay.  That's all I have of this

 7    witness.  Thanks.

 8                   THE COURT:  Thank you.

 9                   Anything further --

10                   MR. COHEN:  No, Your Honor.

11                   THE COURT:  -- Mr. Cohen?  All right, thank you.

12    You may step down, Ms. North.

13                   (Witness excused from the witness stand.)

14                   THE COURT:  And, Ms. North, your witness exclusion

15    only applies until you testified, so you're free to remain here

16    if you'd like.

17                   MR. COHEN:  Your Honor, my next witness will be

18    Danielle Thompson.  She's sometimes referred to as Dani.

19                   THE COURT:  All right.  Counsel, both of you, only

20    Doyle Byrnes is a plaintiff here.  And given that we've already

21    consumed an hour of your very limited time, I would encourage

22    you to try to focus on what's presented to the Court in this

23    petition, if you could.

24                   MR. COHEN:  This is going to be a very narrow

25    examination.

1         THE COURT:  Very well.

2         MR. FERGUSON:  Your Honor, I was just simply going

3    to object that this is cumulative.  The other two students

4    would be cumulative of the issues.

5         THE COURT:  I'll reserve your objection till I

6    hear what the questions are.

7                     DANIELLE THOMPSON,

8    having been first duly sworn to testify the truth, the whole

9    truth, and nothing but the truth, testified as follows:

10                   DIRECT EXAMINATION

11   BY MR. COHEN:

12     Q.  State your name for the record.

13     **A.  Danielle Thompson.**

14     Q.  And up until November 11th, 2010, you were a nursing

15   student at Johnson County Community College?

16     **A.  Yes.**

17     Q.  We're going to kind of fast-forward beyond some issues

18   that you might think I was going to ask you about.

19     **A.  Okay.**

20     Q.  So I want you to focus right now on when you got your

21   photo taken with a placenta.  And tell the Court, where was

22   Amber Delphia and what, if anything, did she say as you were

23   about to get your photo taken.

24     **A.  Okay.  We were in a soiled utility room.  Amber was in**

25   **the room with us.  We had each gotten done examining the**

1   placenta with our gloves on, and we had taken them off.  And

2   then Chrystie asked Amber, "Would it be okay if we took a

3   picture?"  And Amber said, "Well," she said, "let's make sure

4   there's no patient identifiers."  And she said, "Let's move

5   that paper right there."  There was a piece of paper with

6   stickers on it.  That was moved.  And then she said, "Okay."

7   And then everybody put gloves back on and individually posed

8   for the picture with the placenta.

9      Q.   Did you and the other students then move to another

10  room?

11     A.   Yeah, after that we went to the locker room to gather

12  our things for post conference.

13     Q.   And what occurred in there that has anything to do with

14  the photos of the placenta?

15     A.   When we were in the locker room gathering our things,

16  Chrystie was on her cell phone, and Amber said, "What are you

17  going to do with those photos?  Are you going to send them to

18  people?"  Chrystie said, "No.  I'm going to put it on Facebook,

19  though."  And that's when Amber said, "Oh, you girls."  And

20  then we all left the room and walked to the solarium room,

21  which is where we had post conference.

22     Q.   Prior to that event had you ever seen any rule book,

23  code of conduct, or publication of the nursing school that

24  prohibited the taking of photos or posting them to Facebook?

25     A.   No.

1     Q.   Had you ever been advised in a lecture or consultation

2  by any professor or Ms. Delphia that the taking of photos and

3  posting to Facebook was prohibited?

4     **A.   No.**

5     Q.   Have you been dismissed from the nursing school?

6     **A.   Yes.**

7     Q.   And has there been some communication to the effect

8  that you may be considered for readmission in the fall of 2011?

9     **A.   Yes, I was told that I can reapply, fill out a**

10  **readmission packet, turn it in, and that there would be hope of**

11  **coming back next fall.**

12     Q.   Have you, in fact, been granted readmission?

13     **A.   No.**

14     Q.   As you are here today, are you a dismissed ex-nursing

15  student?

16     **A.   Yes.**

17               MR. COHEN:  Nothing further.

18               THE COURT:  Thank you, counsel.

19               Cross-examination, Mr. Ferguson?

20                    CROSS-EXAMINATION

21  BY MR. FERGUSON:

22     Q.   Ms. Thompson, is this your picture?

23     **A.   Yes.**

24     Q.   And you posted that on your Facebook page?

25     **A.   Yes.**

 1      Q.   And did you have any commentary with that?

 2      A.   Yes.

 3      Q.   What was the comments that you posted on your Facebook

 4   page?

 5      A.   There was no caption, but there was a comment asking,

 6   "What is that?"  I then answered, "A placenta."  And then there

 7   was another comment by a fellow nursing student that asked,

 8   "Did you get to start an IV on it?" and I said, "No, but I

 9   wish."

10      Q.   And were there other comments that were posted?

11      A.   On my picture, no.

12      Q.   And when you received a call from Amber Delphia on the

13   evening of Wednesday, December 10th, what did she tell you?

14      A.   She said, "If you have a picture on Facebook, I need

15   you to take it down."  And I said, "Okay."  And I did so

16   immediately.

17      Q.   And then you met with Jeanne Walsh on the 11th?

18      A.   Yes.

19      Q.   Did you understand, at the time of the meeting with

20   Jeanne Walsh on the 11th, as to why you were going to be

21   meeting?

22      A.   Why --

23           THE COURT:  Mr. Ferguson, neither the direct of

24   this witness involved her appeal process, and quite candidly I

25   wasn't sure why we went into the appeals process of the detail

1    process of Ms. North, since she's not a plaintiff before us in

2    this case.  So I'm going to not let you get into that line of

3    questioning.

4                 MR. FERGUSON:  Okay.  Then I will get into the

5    nursing student handbook issue.

6    BY MR. FERGUSON:

7        Q.  Do you recognize this?

8        **A.   Yes.**

9        Q.  What is that?

10       **A.   The Associate Degree R.N. Program Nursing Student**

11   **Handbook.**

12       Q.  Were you given -- I'm sorry, were you given that as

13   part of your program for Johnson County Community College for

14   the nursing program?

15       **A.   I believe so, at the beginning of the first year.**

16       Q.  Okay.  And if you'll turn in your notebook there to

17   Exhibit 405, I have some exhibits or some excerpts, I should

18   say, from the nursing handbook.

19       **A.   (The witness complies.)**

20       Q.  If you'd turn to page 5 in the lower part of that, it

21   says page 5, the Code of Conduct.  You see that?

22       **A.   Uh-huh.**

23       Q.  Is that a "yes"?

24       **A.   Yes.**

25       Q.  Were you required to sign a code of conduct?

1     A.   Yes.

2     Q.   And did you -- and to your knowledge, did the other

3 students sign a code of conduct?

4     A.   Yes.

5     Q.   Would you read to the Court that first sentence,

6 please.

7     A.   **"The nursing faculty and administration believe that**

8 **the standards of professional practice must be maintained at**

9 **all times and in all settings."**

10    Q.   Okay.  And do you -- is it your belief that the nursing

11 program had to specifically tell you not to post what it

12 considered to be inappropriate or unprofessional pictures on

13 your Facebook page?

14              THE COURT:  That's a very confusing question.

15 You're going to have to redo that completely.

16 BY MR. FERGUSON:

17    Q.   Mr. Cohen asked you whether or not you were ever told

18 about -- or warned not to post things on your Facebook page.

19 You remember that?

20    A.   **Uh-huh, yes.**

21    Q.   In the nursing program are you encouraged to engage in

22 your own independent thought and be involved in making

23 decisions in the nursing program?

24    A.   **There's no policy regarding social media, if that's**

25 **what you're asking me, and also we're taught that in clinical**

1    **we're practicing under the license of our clinical instructor,**

2    **and so in the clinical setting she's responsible for us.**

3        Q.   Okay.  But you're taught to engage in independent and

4    critical thinking and make your own decisions, right?

5        **A.   Yes.**

6        Q.   And there may not always be another nurse there to

7    supervise your work in the real world?

8        **A.   In the real world outside of nursing school?**

9        Q.   Yes.

10       **A.   Correct.**

11       Q.   So you have to think about the impact of the decisions

12   that you're making with the patient, right?

13       **A.   Yes.**

14       Q.   And the -- and, in fact, the clinical expectations, you

15   understand that the behaviors in the clinical program are

16   evaluated by Ms. Amber Delphia and the other administrators in

17   the nursing program?

18       **A.   Yes.**

19       Q.   Okay.  And do you -- you understand that they believe

20   that your posting of this picture and the comments was

21   unprofessional and disrupted the learning environment?

22       **A.   That's what they think, yes.**

23       Q.   Okay.  You don't think so?

24       **A.   I don't think I was unprofessional.**

25       Q.   Who else was present when you were in the locker room

1    and you were visiting with Amber Delphia?

2        A.   **Chrystie North, Jamie Vande Brake, Katie Nichols,**

3    **Jenny -- can't think of her last name.  Our entire clinical**

4    **group was in the locker.**

5        Q.   Was she engaged in the conversation with you about the

6    Facebook, posting it on Facebook?

7        A.   **Who?**

8        Q.   Amber Delphia?

9        A.   **Yes.**

10       Q.   And did she say yes, you could post that on the

11   Facebook?

12       A.   **She gave implied consent.**

13       Q.   "Implied consent" meaning she didn't tell you that, but

14   you just thought, based on the circumstances, that she said

15   that she would agree that that was okay?

16       A.   **When she asked what the intent was to put the photos --**

17   **where the photos would go, and she was told they were going on**

18   **Facebook, she said, "Oh, you girls."**

19       Q.   So "oh, you girls" is interpreted, in your mind, to

20   mean that it was okay?

21       A.   **Yes.**

22       Q.   And you understand that she denies that that was --

23   that she gave consent --

24              THE COURT:   We'll let Ms. Delphia give her own

25   testimony.

```
1              MR. FERGUSON:  Okay.  Thank you.

2              THE COURT:  Anything further?

3              MR. COHEN:  Nothing further.

4              THE COURT:  All right.  You may step down.

5              (Witness excused from the witness stand.)

6              THE COURT:  If you would stand up here, and in

7    just a second someone's going to give you an oath.

8              THE WITNESS:  Okay.

9              THE COURT:  And then after you've taken the oath

10   you can be seated.

11                        JAMIE VANDE BRAKE,

12   having been first duly sworn to testify the truth, the whole

13   truth, and nothing but the truth, testified as follows:

14             MR. COHEN:  You may be seated.

15                        DIRECT EXAMINATION

16   BY MR. COHEN:

17     Q.  Please state your name for the record.

18     A.  Jamie Vande Brake.

19     Q.  Until November 11th, 2010, were you a nursing student

20   enrolled in the nursing program at Johnson County Community

21   College?

22     A.  Yes.

23     Q.  I'm confident, Jamie, that you were expecting me to

24   take you through a long series of questions, but we're going to

25   shorten it up quite a bit.
```

1     A.   Okay.

2     Q.   I'd like you to tell the judge about those things that

3     occurred in the dirty utility room from the time you got there

4     until that clinical day was over.

5     **A.   Okay.  When I entered the room, the majority of our**

6     **clinical group was in there examining a placenta and our**

7     **instructor, Amber Delphia, was there.  And we went through**

8     **identifying the veins and arteries of the placenta, and the**

9     **dirty side of the placenta and the clean side for -- to**

10    **identify which side belonged to the baby and which ones**

11    **belonged to the mother.  And we basically just went through**

12    **that, and Chrystie asked if we could take a picture with it,**

13    **and with the placenta, and we took turns doing that.**

14                THE COURT:  Who did Chrystie ask?

15                THE WITNESS:  She asked Amber Delphia.

16                THE COURT:  And what did Amber respond?

17                THE WITNESS:  She said yes, we could.

18                THE COURT:  Okay.

19                THE WITNESS:  Making sure that we first had no

20    identifying -- anything to identify the patient or the site in

21    the picture.  And then once -- I think there were labels or

22    something on the countertop that we moved, and once that was

23    moved, then it was okay for us to take a picture, and she said

24    that we could do it.  And we all took a photograph of the

25    picture -- not everyone, I guess, in there.  Four of us, five

 1    of us, actually.  And then we -- that was pretty much it in the

 2    dirty utility room.

 3              And then we were about to pack up and leave for

 4    the day.  We were going into the locker room to get our

 5    belongings.  And we went into the locker room, and Chrystie had

 6    her phone and was typing on it, and Amber had asked her what --

 7    she asked her if she was sending those to people, and she said

 8    no, that she was putting it on Facebook.  And I was standing

 9    right next to Chrystie when this occurred.  And Amber just

10    smiled and said, "Oh, you girls."  And that was pretty much the

11    end of that part of it.

12              We packed up our bags and went into -- it was time

13    for post conference, and went into another room for post

14    conference, where we had said -- we were just all talking about

15    our day and everything that had happened that day.  It was a

16    pretty exciting day for most of the students.  A lot of us had

17    seen many things for the first time, and we were discussing

18    everything, and we were also discussing that it was going on

19    Facebook as well.

20              THE COURT:  Was Amber present during this

21    discussion?

22              THE WITNESS:  She was present in the room.

23    BY MR. COHEN:

24       Q.  Back to when Amber posed her question to Chrystie.  Did

25    she use the words, "What are you going to do with the placenta

1    photos?" or how did she phrase that?

2      A.   Well, we were talking about the placenta -- she knew

3    that she was -- she -- she said, "Are you sending those to

4    people?"  As far as I remember, just "Are you going to send

5    those to people?"  And Chrystie was, like, "No.  I'm just

6    putting it on Facebook."

7      Q.   What is your status with the Johnson County Community

8    College nursing program today?

9      A.   I'm dismissed.

10     Q.   Has the school posed the possibility of readmission?

11     A.   We had been given hope that we will be.  I believe that

12   the letter states that Jeanne Walsh, the director, would

13   support our readmission.  I have nothing that is a hundred

14   percent guaranteed that I will be readmitted.  It's just an

15   assumption that if I do follow through with an ethical project

16   that's supposed to be done in January here, that we would be

17   readmitted in the fall.

18             MR. COHEN:  I believe that's all I have for you.

19   Thank you.

20             THE COURT:  Thank you, Mr. Cohen.  Mr. Ferguson.

21                      CROSS-EXAMINATION

22   BY MR. FERGUSON:

23     Q.   Ms. Vande Brake, is that your picture?

24     A.   Yes.

25     Q.   Did you have any commentary on the Facebook page along

1   with that picture?

2      A.   I might have.  I don't -- I don't remember what I put

3   up there.  I mean, I know that there's other people that

4   commented on it.

5      Q.   So there would have been your comments as well as

6   others on the Facebook?

7      A.   Uh-huh.

8      Q.   Is that a "yes"?

9      A.   Yes.

10     Q.   Did you save any of those comments?

11     A.   No.

12     Q.   I hand you what's been marked as Defendant's

13  Exhibit 425.  Do you recognize that?  Do you recognize that?

14     A.   Yes.

15     Q.   Would you please read that or describe what it is.

16     A.   It's an e-mail that I sent to Ms. Delphia saying I was

17  turning in my CNPR document, and I wrote, "Hey Amber, here's my

18  CNPR for this week.  I'm so sorry for posting the picture on

19  Facebook.  I hope this did not cause you to get in any trouble,

20  and I removed it immediately.  Sorry again, what is your

21  favorite candy?  I'll bring you some next clinical, Jamie." (As

22  read.)

23     Q.   Your testimony is that the question was asked, "Are you

24  going to send those pictures to people?" and the answer was no,

25  they're going to post that on Facebook.  Do you know if Amber

1  Delphia heard the answer as to what the intention was?  Do you

2  know specifically?

3      **A.    She smiled, she was right there and smiled and said,**

4  **"Oh, you girls."**

5      Q.   Did she say "okay," or did she say, "No, don't do

6  that"?

7      **A.   No.**

8      Q.   You're just assuming that, based on her reaction, she

9  knew what the intent was?

10     **A.   Yes.**

11     Q.   And if -- if she had given you permission that

12  afternoon in the locker room, why did you feel like that night

13  on November 10th at 8:14 to apologize for posting the picture

14  on Facebook?

15     **A.   Just from the fact that she had called us to tell us to**

16  **remove it, so I knew that something had happened.  I had no**

17  **idea that we were in trouble, but I knew -- she just said that**

18  **she had received e-mails or calls from the school, and**

19  **stated -- told us to remove it immediately, and I said, "Okay,**

20  **we'll remove it."**

21     Q.   No questions asked at that point?

22     **A.   No.**

23     Q.   You didn't raise the question with -- you didn't raise

24  the defense at that point with Amber that, "Well, you told us

25  earlier in the day that you could post it"?

1      A.   No.  It was a very short phone conversation.

2      Q.   Okay.  You knew at that point that you should remove

3   the Facebook posting --

4      A.   Yes.

5      Q.   -- without further discussion?

6      A.   Yes.

7      Q.   Okay.  You didn't question her and say, "Well, I'm

8   going to leave it on there because you told us we could"?

9      A.   No.

10     Q.   All right.  Do you know if Amber uses Facebook or knows

11  anything about it?

12     A.   I don't know.

13     Q.   Have you ever communicated with her on Facebook?

14     A.   Nope.

15     Q.   Okay.  And she didn't specifically tell you that you

16  could post the picture on Facebook; you just assumed that,

17  based on the circumstances, that she was okay with it?

18     A.   Yes.

19     Q.   Okay.

20          THE COURT:  Why in your e-mail did you say to

21  Ms. Delphia, "I hope you don't get in trouble," or however you

22  worded it?  What about this made you think that she would get

23  in trouble?

24          THE WITNESS:  Just from her phone call, that she

25  had stated that "I'm receiving phone calls from the school, you

1  need to take the picture down."  So I just --

2                 THE COURT:  But how would that get her in trouble?

3                 THE WITNESS:  I -- I don't know.  I just assumed

4  that she had been called from the school.  So I thought maybe

5  she was in trouble and they wanted her to tell her clinical

6  students to take the photo down.

7                 THE COURT:  All right.

8                 MR. COHEN:  A very brief redirect.

9                 THE COURT:  All right.

10                      REDIRECT EXAMINATION

11 BY MR. COHEN:

12    Q.   Did it occur to you during the phone conversation the

13 evening of November 10th that Ms. Delphia had in some way been

14 responsible for permitting the posting of the photos to

15 Facebook?

16    **A.   I definitely feel that she was a part of what happened**

17 **that day.  She -- we -- I don't do anything without getting**

18 **permission and making sure that it was okay first, and we asked**

19 **for permission to take the photo and received the permission,**

20 **and I felt that she had knowledge that it was going on Facebook**

21 **and did not say anything.  So I felt that we were doing**

22 **everything professional and in the correct way by making sure**

23 **that there was no identifying things in the photo.  So I did**

24 **think that everything was okay.  I didn't foresee any trouble**

25 **coming from this.**

1    Q.   One follow-up, if the Court will indulge me.  Between

2   that time and today, have you ever been given an opportunity to

3   fully explain the events of that day to anyone in authority at

4   Johnson County Community College --

5              THE COURT:  Mr. Cohen, I think we're going to

6   limit the procedural appeal issues to the actual plaintiff in

7   the case.

8              MR. COHEN:  All right.

9              THE COURT:  In the interest of time.

10              MR. COHEN:  Thank you.  Nothing further.

11              THE COURT:  Within the scope of that redirect, do

12   you have any cross, Mr. Ferguson?

13                        RECROSS-EXAMINATION

14   BY MR. FERGUSON:

15    Q.   You've already acknowledged that Amber -- she knew that

16   you were taking a picture of the placenta in that soiled

17   utility room.  And she went to the trouble of making sure that

18   there wasn't any patient information or there wasn't anything

19   identifiable?

20    **A.   Correct.**

21    Q.   But at that point in time, just because she knew that

22   you were going to take the picture, that's not the same as

23   knowing that you're going to post that on Facebook when you're

24   standing there in the utility room, right?

25    **A.   In the utility room, yes.  But in the locker room,**

1   **when, you know, we were discussing it, I definitely felt that**

2   **she knew what was happening.**

3       Q.   Okay.  And you said you always seek permission first.

4   And at least according to the way you described the events,

5   somebody was already posting -- in the process of posting that

6   on their cell phone, taking the picture from their cell phone

7   and posting it on Facebook, and that's what led to the

8   discussion?

9       **A.   Well, not in the dirty utility room.**

10      Q.   No, no, in the locker room.

11      **A.   In the locker room, yes.**

12      Q.   That's your testimony, that somebody was posting it and

13  she said, "What are you doing?  Are you sending that to

14  somebody?"

15      **A.   Yes.**

16      Q.   So you didn't have -- you didn't have consent or you

17  didn't have permission before that?

18          THE COURT:  Well, counsel, she's not the one that

19  was doing it.

20          MR. FERGUSON:  I understand.

21          THE COURT:  Well, then I don't understand your

22  question, because you're saying she said she always sought

23  permission.  She didn't seek permission before what somebody

24  else was doing.

25  BY MR. FERGUSON:

1      Q.   Did you specifically ask Amber Delphia if you could

2   post pictures on the Facebook page?

3      **A.   No.**

4               THE COURT:  You can step down now.  Thank you.

5               MR. COHEN:  I call Doyle Byrnes.

6                    DOYLE BYRNES,

7   having been first duly sworn to testify the truth, the whole

8   truth, and nothing but the truth, testified as follows:

9                    DIRECT EXAMINATION

10  BY MR. COHEN:

11     Q.   State your name for the record.

12     **A.   Doyle Byrnes.**

13     Q.   Until November 11th, 2010, were you a nursing student

14  at Johnson County Community College's nursing program?

15     **A.   Yes, I was.**

16     Q.   And you've, of course, been in court to hear the

17  testimony of the other students.  I will limit my questions

18  about that day's event to the matters that focus on your entry

19  into the dirty utility room.  Who was there?

20     **A.   Are you asking who was in the dirty utility room?**

21     Q.   Yes.

22     **A.   It was myself, Amber Delphia, and Chrystie North, Jamie**

23  **Vande Brake, Danielle Thompson, Jenny Sixta came in and so did**

24  **Katlyn Nichols.**

25     Q.   How many students got their photograph taken with the

1   placenta?

2       **A.   Five students.**

3       Q.   And that would be the four of you who've testified

4   today, and who was the fifth?

5       **A.   The fifth student was Lena Ekstrom.**

6       Q.   To your knowledge, did Lena post her photo to Facebook?

7       **A.   No, she did not.   Lena does not have a Facebook.**

8       Q.   Is there any doubt in your mind that Ms. Delphia knew

9   that photos were going to be taken and agreed that they could

10  be taken?

11      **A.   There is no doubt in my mind that Mrs. Delphia was**

12  **aware.**

13      Q.   After the examination of the placenta, do you agree, as

14  the other witnesses have testified, that everybody went to the

15  locker room?

16      **A.   Yes.**

17      Q.   And what's the purpose of going to the locker room?

18      **A.   We leave all our bags, like backpacks and stuff.   As**

19  **students, we have a lot of books we bring with us we don't need**

20  **to be carrying on the floor constantly, so we leave them in the**

21  **locker room kind of to the side to not be in the nurses' way.**

22  **So before post conference, which was going to be immediately**

23  **after our examination of the placenta, we went to the locker**

24  **room to go grab our stuff.**

25      Q.   And what occurred in the locker room that has any

1    relevance to the posting of the photos on Facebook?

2        **A.   What I remember is Amber Delphia approaching Chrystie**

3    **North and asking her "Who are you planning to e-mail the photos**

4    **to?" and Chrystie replying, "I'm not planning to e-mail them to**

5    **anyone.  I'm going to put them up on my Facebook."**

6        Q.   And did you actually hear Amber's reply?

7        **A.   Yes, her reply was, "Oh, you guys," and kind of smiling**

8    **at us.**

9        Q.   And what conclusion, if any, did you draw from that

10   reply?

11       **A.   My impression from Amber's reply was that it didn't**

12   **matter either way.**

13       Q.   Now, let me direct your attention to your personal

14   status as you sit before this court.  Have you been dismissed

15   from the nursing program?

16       **A.   Yes.**

17       Q.   Do you have any bona fide promise of readmission?

18       **A.   No, I do not.**

19       Q.   Do you have any hope for readmission?

20       **A.   I'm not sure that I do because the other three girls**

21   **were offered an ethical project that I was not offered.**

22       Q.   And with regard to any possibility of being readmitted

23   for the fall of 2011, is that an opportunity that you can take

24   advantage of?

25       **A.   No, it really is not, as I'm getting married in August**

1    to my fiance, who currently resides and works in Virginia.

2       Q.   And have you made any inquiry about resuming your

3    nursing education at a nursing school in Virginia?

4       A.   Not as of today.

5       Q.   Do you have a concern about your ability to qualify for

6    admission at another nursing school if your dismissal stands?

7       A.   Yes, I'm very concerned, as my name is all over the

8    Internet and all you have to do is Google the word "placenta"

9    to find it, that if they even type in my name that they would

10   see that I was not -- I was dismissed from school, and after --

11   if they -- one of the questions that many, you know, you have

12   been asked is have you attended a previous school before, and I

13   would have to tell them yes and that I was dismissed and as to

14   why.

15      Q.   Doyle, have you refused to speak with the press?

16      A.   Yes, I have gotten a lot of phone calls -- and my mom

17   can attest to this -- to the house, and we've been ignoring

18   them.  And anyone that we accidentally pick up, we've said, "No

19   comment."

20      Q.   And have you refused to be photographed for news

21   articles or to in any way encourage publicity?

22              MR. FERGUSON:  Object, Your Honor, for relevance.

23              MR. COHEN:  The relevance has to do with whether

24   she has contributed to any damage that she might suffer.  I

25   just want the Court to know she's tried to stay away from that.

 1              THE COURT:  All right.  I'll allow it.

 2    BY MR. COHEN:

 3      Q.   Have you in any way encouraged or contributed to the

 4    publicity that apparently is now worldwide?

 5      **A.   No, I have not.**

 6      Q.   Did you pay some amount of money for tuition and fees

 7    for the fall 2010 semester?

 8      **A.   Yes.**

 9      Q.   The Court and Mr. Ferguson have Exhibit 19, and I'm

10    going to ask you to identify that.

11      **A.   This is a list of estimated expenses that we were**

12    **given.  I believe it's in our nursing application packet.  It**

13    **lists the estimated expenses of the full nursing program before**

14    **taxes for the 2009 to 2010 years.**

15      Q.   Have you paid some amount of money and incurred some

16    expense to take the OB-GYN clinical course?

17      **A.   Yes, I have.**

18      Q.   And did you get the credit for the course that you paid

19    for?

20      **A.   No, I did not.**

21      Q.   Have you been offered a refund?

22      **A.   No, I have not.**

23      Q.   So is that money that you spent for that course

24    essentially lost?

25      **A.   Yes.**

1    Q.  Prior to November 10th, 2010, did you have an

2  expectation of employment as a registered nurse after receiving

3  your degree in May 2011?

4    **A.  Yes, I did.**

5    Q.  And what degree were you going to get?

6    **A.  The associate's degree in nursing.**

7    Q.  And would that qualify you to be licensed as a

8  registered nurse?

9    **A.  Yes, once I passed the NCLEX.**

10   Q.  And you have some personal knowledge of the general pay

11  scale for registered nurses in this community or in Virginia?

12   **A.  I am hoping to make a starting rate of 50,000.**

13   Q.  And as a result of being dismissed from the school,

14  unless this court reinstates you and you graduate in May, will

15  you have lost the first $50,000 of your potential income?

16   **A.  Yes.**

17        MR. FERGUSON:  Object to the relevance.  It's

18  highly speculative.  It assumes that she would --

19        THE COURT:  I think a party's entitled to give

20  testimony as to their own estimation of their damage, so I'm

21  going to allow it.

22  BY MR. COHEN:

23   Q.  Doyle, do you believe there's a possibility that if

24  you're not reinstated by court order, that you will not be

25  accepted at another nursing school in Virginia or anywhere

1   else?

2      **A.   Yes, I believe it's a possibility that I will not be**

3   **accepted elsewhere.**

4      Q.   And do you have a belief as to the financial harm that

5   would come to you if that were the result?

6      **A.   Well, I would imagine that I wouldn't be making an**

7   **income as a registered nurse.**

8      Q.   Are you qualified to do anything else?

9      **A.   Not at this time.**

10     Q.   There are a number of issues that I have a duty to

11   address to prevail in an injunction hearing and I'd like to ask

12   you a few questions in relation to some of those obligations.

13          Do you have any knowledge of any harm that would come

14   to Johnson County Community College by your readmission?

15              THE COURT:  I think that's an issue that the Court

16   can take up.

17              MR. COHEN:  All right.  Thank you.

18   BY MR. COHEN:

19     Q.   There is an Exhibit No. 17 that I would like to show to

20   the witness.  Let me hand you Exhibit 17 and ask you if you can

21   identify that.

22     **A.   This is on JCCC's web site, and it talks about working**

23   **as a registered nurse in the Kansas City area, as well as kind**

24   **of pay expectations.**

25     Q.   And does it address anything about the need for nurses

1  in this country?

2     **A.   Yes.  It says something that there's a large growth**

3  **of -- for -- in the second sentence it says, "Employment of**

4  **registered nurses is expected to grow much faster than average**

5  **for all occupations through 2018, and, because the occupation**

6  **is very large, many new jobs will result."**

7     Q.   Do you believe that but for this incident, you would be

8  qualified to be a good nurse?

9     **A.   Yes.**

10    Q.   And do you believe it would be in the public interest

11 for you to be allowed to serve as a nurse?

12           MR. FERGUSON:  Object.

13    **A.   I believe so, yes.**

14           MR. FERGUSON:  Lack of foundation for this

15 witness.  I mean, we're talking --

16           THE COURT:  He's asking for her opinion.  But,

17 Mr. Cohen, I think we've pretty much exhausted this area, and I

18 think what we really want to hear about are her procedural

19 appeal rights with respect to your procedural due process

20 claim.

21           MR. COHEN:  All right.  Thank you, Your Honor.

22 BY MR. COHEN:

23    Q.   Let's go back to the morning of November 11th.  And how

24 is it -- well, I don't want to put words in your mouth at all.

25 I want you to tell the Court what happened that morning.

1     A.   I believe it was in the 10:00 o'clock hour that Gale

2  Cummings, director Jeanne Walsh's secretary, contacted me by my

3  cell phone and left me a message, saying that we needed to --

4  or that I needed to come in and meet with Ms. Walsh that day.

5  It was only a couple hours later.  And I got the message, got

6  up and got dressed really quick and got ready, and made it to

7  school, and met Dani and -- Danielle Thompson, Jamie Vande

8  Brake and Chrystie North in the hallway outside of Jeanne

9  Walsh's office.

10        And then they were all sitting there and they were kind

11  of worried, and they asked me if I was worried.  And I said,

12  "No.  Are you guys worried?"  And she said, "Well" -- I can't

13  remember who said it, but they were like, "Well, we're in

14  trouble."  And I said, "Well, I asked" -- 'cause, you know, we

15  all got called.  We knew we had all gotten called.  And I said,

16  "Well, when Amber called me I asked if we were in trouble and

17  she said no.  So I can't imagine that this is a very big deal."

18        So we went in to -- since we were all there, we went to

19  Jeanne Walsh's office, and she -- we came in and I said hello,

20  and she turned around and was smiling, but then I think when

21  she realized it was the four of us, she asked us to go back out

22  into the hall, and she stopped smiling and said, "Just go back

23  into the hall and wait until you're called."

24        So we went back out in the hall.  Then Karen LaMartina

25  came in, and I believe Gale Cummings came out into the hall and

1   got us and we came in.  And as I remember it, Jeanne Walsh was

2   sitting behind the desk and Karen LaMartina was sitting on the

3   side of the desk, then we're all four sitting in front.  And

4   Jeanne Walsh said -- turned around and her face was red, and

5   she said, "I hope I can maintain or control my anger for this,"

6   and referring to the meeting.  And then she paused, and we just

7   kind of sat there because we were frightened.  And she said,

8   you know, "Do we all know why we're here?"  And we said yes.

9   And she said -- I mean, she just paused for a little bit.  Then

10   she said, "What were you thinking?"  And I believe Dani said,

11   "Well, it wasn't a HIPAA violation," 'cause Dani had looked up

12   HIPAA and we knew we had taken the patient identifiers out, and

13   it didn't seem to -- appear to us to be a HIPAA violation by

14   what we had read in the HIPAA.  And she said, "Of course, it's

15   a HIPAA violation.  Why would you even think that?"

16        And then -- so that kind of made us be quiet again,

17   'cause we just couldn't believe that we were getting in so much

18   trouble.  And then Jamie said, "How is it that we can be in so

19   much trouble when we asked our instructor if we could do it?"

20   And at that point she was also cut off because Karen LaMartina

21   said, "Don't throw your instructor under the bus."  And at that

22   point I said, well, I wanted to say something about Amber while

23   we're here.  That's something I did want to say and bring up,

24   because I had sent an e-mail, much like Jamie and Chrystie did

25   the night before, saying to Amber that I was worried that she'd

 1   be in trouble and that I hoped if there was anything I could do

 2   for her so she wouldn't be in trouble, and I wanted to say

 3   that.  And I told them at that meeting Amber's a really great

 4   teacher and I hope she didn't get in trouble for this.  And so

 5   I thought I had responded to "don't throw your instructor under

 6   the bus."

 7          And again they asked us, "What are you thinking?  What

 8   were you thinking?"  And we just kind of -- every time we tried

 9   to explain ourselves, I felt we got cut off.  And eventually

10   Jeanne Walsh said that we're all dismissed, and that Chrystie

11   said, "Well, can we reapply?"  And she said, "I don't even know

12   if I want you back.  I don't even know if you're going to get a

13   W or an F at this point."  And so we're, like, okay.  And she

14   then said, "If you have any more questions, you can go talk to

15   Dennis Day."  And so we left, and Chrystie and Jamie and Dani

16   were all crying, and Dani was crying so much that she just went

17   home.

18          So then Chrystie, Jamie and I went up to Dennis Day's

19   office.  And he had been alerted that we were coming over there

20   because I think why are these three girls crying and coming

21   over to your office merited a warning.  And he sat us down and

22   pulled up the student code of conduct on JCCC's web page, which

23   I believe Chrystie was talking about earlier, and there's -- on

24   the web page he pulled up, he printed it out for us and

25   highlighted number nine, which refers to disruptive behavior at

1    Johnson County Community College, which is what Jeanne Walsh

2    referred to when I asked her -- if I can go back a minute, when

3    I'm back in the room, I asked her, "It takes me a couple times

4    to figure something out, Mrs. Walsh, and I think I missed it.

5    Can you please tell me again why exactly we're being

6    dismissed?"  And she referred to the Student Code of Conduct on

7    the JUCO's web site, No. 9, which then later Dennis Day printed

8    out and showed to us.

9        Q.   Now, that code of conduct was not the reason in the

10   subsequent letters confirming your dismissal; is that correct?

11       A.   Yes, that's correct.

12       Q.   In fact, those letters refer to the nursing code of

13   conduct, as opposed to the general student code of conduct?

14       A.   That is correct.  And she referenced page 5.

15       Q.   So prior to this incident had you been aware, by

16   reading any publication, hearing any lecture, being addressed

17   by any professor or instructor that you were not to take photos

18   and you were not to post them to social media sites?

19       A.   No, I had not.  In fact, we were actually encouraged to

20   take photos for our senior slide show, and I've had teachers

21   approach me and say, "Make sure you bring your camera to this

22   event."

23       Q.   Let me ask you if you can identify what's been marked

24   as Plaintiff's Exhibit 14.

25       A.   This is an e-mail that all the students received from

1    Karen LaMartina a couple days after our dismissal that said

2    effective immediately you are not allowed to have any cell

3    phones, personal electronic devices, or anything that can

4    transmit information on the clinical site, and if you do have

5    it you need to leave it in your car, you can't just keep it in

6    your backpack, such as in the locker room.

7       Q.   So would you characterize that e-mail as a warning to

8    students?

9       A.   Oh, yeah, especially because it said "effective

10   immediately."  It was all in bold.

11      Q.   And so that was a warning given to the students after

12   the fact?

13      A.   Yes.

14      Q.   Did I act on your behalf to file an appeal that was

15   based on instructions to you from Jeanne Walsh as to what type

16   of appeal you were to follow?

17      A.   Can you rephrase the question?

18      Q.   Yeah, I better.  You know that on December 2nd, 2010, I

19   wrote a lengthy letter to Dr. Clarissa Craig?

20      A.   Yes.

21      Q.   And that in that letter I argued that the academic

22   appeal was inappropriate?

23      A.   Yes.

24      Q.   And did you agree with that argument?

25      A.   Yes, I did.

1    Q.   And essentially were you acting through your attorney,

2    telling the school that you desired to have a disciplinary

3    appeal and that you thought you were entitled to a disciplinary

4    appeal?

5    **A.   Yes, especially because I felt any time I tried to talk**

6    **to anyone they would cut me off or not believe me.**

7    Q.   And are there, in your opinion, advantages to a

8    disciplinary appeal?

9    **A.   Yes, I do believe so, as I can call upon witnesses and**

10   **provide my own evidence.**

11   Q.   Were you ever, up to this point, allowed to call

12   witnesses, offer evidence, cross-examine the school's

13   witnesses?

14   **A.   No, I was not.**

15   Q.   Were you ever granted anything that appeared to be a

16   hearing, in your opinion?

17   **A.   No, I was not.  I didn't even feel like my original**

18   **appeal had been read.**

19   Q.   And you know that I sent Dr. Craig the original formal

20   appeal letter December 2nd, correct?

21   **A.   Yes.**

22   Q.   And I told her I represent Doyle Byrnes, right?

23   **A.   Yeah, it even said so at the bottom.**

24   Q.   And did she call you and demand that you come see her

25   without alerting me?

1      A.   Yeah.   She called me a couple days later and asked to

2   meet with her, and I said okay and agreed to a time.   And then

3   I called my attorney because I thought, you know, he had

4   already knew about it and, you know, I just was like, okay.   So

5   I called him and said I'm meeting with Dr. Craig at this time,

6   and he was unaware that that had happened until I told him.

7      Q.   Doyle, Exhibit 9 is in evidence.   It's my e-mail to

8   Dr. Craig, December 7th, the day before your meeting, that you

9   and I discussed that I would send her an e-mail and confirm my

10   phone conversation with her that although I would permit you to

11   meet with her, in the hopes this could be turned around, she

12   and I both agreed that this was not to be part or a substitute

13   for a formal appeal process?

14      A.   Yes, that's true.

15            MR. FERGUSON:  Your Honor, this is argument, not a

16   question to the witness.

17            THE COURT:  Sustained.

18   BY MR. COHEN:

19      Q.   Were you relying on my e-mail to Dr. Craig when you

20   appeared the next day and consented to speak with her?

21      A.   Yes, I was.

22      Q.   Did you know, when she interviewed you December 8th,

23   2010, that back on November 15th, 2010, she had addressed a

24   substantial part of the nursing student body and already

25   condemned your behavior?

1    **A.   Yes, I do know that.**

2    Q.   Well, you know it now.  Is that what you're saying?

3    **A.   Well, yes, I know it now.  I did not know it at the**

4    **time, at the meeting.**

5    Q.   Would you have appeared in Dr. Craig's office

6    December 8th, 2010, in the hopes of being readmitted if you

7    knew that she had publicly condemned your behavior on November

8    15th, 2010?

9    **A.   I mean, I guess I would have given it a shot, but I**

10   **would have had less hope than I did as knowing she already had**

11   **an opinion about it.  I was told that she was not associated**

12   **with it and that I would have -- that she was keeping her**

13   **distance from this so that she could be an effective person to**

14   **decide on my case, if I should choose to appeal to her.**

15   Q.   When Dr. Craig was considering your matter, were you

16   permitted to appear at any hearing where you could call

17   witnesses, cross-examine witnesses, or present evidence on your

18   behalf?

19   **A.   I was not called to any sort of hearing.**

20          MR. COHEN:  I want to try to shorten up this

21   matter.

22          THE COURT:  It's a little late for that.  We're

23   running long already, but try to be as quick as you can.

24          MR. COHEN:  Yes, yes.  Your Honor, I had intended,

25   before I rested, to call Dr. Craig and lay a foundation for --

 1              THE COURT:  Mr. Ferguson, who all do you intend to

 2    call in your case?

 3              MR. FERGUSON:  I'd like to call all the witnesses.

 4              THE COURT:  Well, I'm asking you who the witnesses

 5    are.

 6              MR. FERGUSON:  I mean, all the defendants, all the

 7    people that are here today.  We provided detailed affidavits

 8    for your court to --

 9              THE COURT:  You provided stuff for me too late to

10    read.

11              MR. FERGUSON:  I understand, I understand, but

12    they are here and they've been named as individual defendants,

13    so I would call each one of them.

14              THE COURT:  All right.  Well, Mr. Cohen, you're

15    pretty much out of time.  I told everybody at the beginning of

16    this hearing we had only this afternoon and to reserve time for

17    argument, so --

18              MR. COHEN:  May I have two minutes?

19              THE COURT:  I'll give you 120 seconds.

20              MR. COHEN:  All right.

21    BY MR. COHEN:

22      Q.  Let me show you Plaintiff's Exhibit 15 and ask you if

23    you can identify that.

24              THE COURT:  Well, did she hear it?

25              MR. COHEN:  Yes.

1          THE COURT:  Oh, you were present?

2          MR. COHEN:  She heard the recording.

3          THE WITNESS:  I have heard the recording of this

4    dialogue that's printed out here.

5          THE COURT:  Why don't we introduce that through

6    someone who actually heard it live and knows who it was given

7    to.

8          MR. COHEN:  That'd be Dr. Craig.

9          THE COURT:  I don't think this witness can lay a

10   foundation for that.

11         MR. COHEN:  Well, Your Honor, I don't want to take

12   up a lot of time, but I do believe that Rule 901 --

13         THE COURT:  We'll qualify it through Dr. Craig.  I

14   don't think it's going to be disputed.  I just don't think this

15   witness can lay a foundation for it.

16         MR. COHEN:  Very well.

17         THE COURT:  She can testify that Dr. Craig said

18   it, but she can't testify who heard Dr. Craig say it because

19   she's only heard an audio recording and wasn't present when it

20   was delivered, so that's why she can't lay a foundation for it.

21         MR. COHEN:  Thank you.  Then I'm done with this

22   witness.

23         THE COURT:  Thank you.  Mr. Ferguson, you may

24   examine.

25                    CROSS-EXAMINATION

 1   BY MR. FERGUSON:

 2      Q.  I want to ask you about some exhibits in this notebook,

 3   okay.

 4      **A.  Okay.**

 5      Q.  They're all tabbed here.  The first is Exhibit 419, if

 6   you'll turn to that.  And 419 is the Student Code of Conduct,

 7   Policy No. 319.01.  Is that the code of conduct that you're

 8   referring to?

 9      **A.  This is the code of conduct that Jeanne Walsh mentioned**

10   **and then Dr. Day clarified for us.**

11      Q.  Okay.  And on page 3 of that code of conduct, on

12   Exhibit 419, Item No. 9, Disruptive Behavior, is that the

13   provision that you were relying -- that you indicated that

14   Dr. Day talked about?

15      **A.  Yes.**

16      Q.  Okay.  And it says, "No student shall behave in a

17   manner that is unacceptable in a learning environment or that

18   endangers or infringes upon the rights and/or safety of

19   themselves or other students" --

20              THE COURT:  I can read.

21   BY MR. FERGUSON:

22      Q.  Okay.  And that's what he went over with you?

23      **A.  Yes.**

24      Q.  Did he also -- if you turn to Exhibit 421, the student

25   academic appeals process, 319.03 -- did he also at any time go

1    over that with you, present you a copy of that?

2        A.   I believe so, yes.

3        Q.   Okay.  And so you understand that the academic appeal

4    that's in that particular policy was what you would follow in

5    the due process or the steps of your appeal?  You understood

6    that, did you not?

7        A.   Can you explain the due process fact of it?

8        Q.   Sure.  Okay.  He gave you -- you've admitted that he

9    gave you policy 319.03.

10       A.   Yes.

11       Q.   And that was right after you left Jeanne Walsh's office

12   and went to visit him?

13       A.   That is correct.

14       Q.   And he offered himself as a resource to be an advocate

15   for you during that process?

16       A.   Well, I don't believe he said advocate, because he said

17   he couldn't be involved very much, but he could at that time

18   show us the correct documentation we would need.

19       Q.   Okay.  He offered himself as a resource so that you

20   could follow the steps that were in the academic appeals

21   process?

22       A.   Yes, as no one else had told us about the appeals

23   process, Dennis Day was the first one to bring that up.

24       Q.   And that was on November -- I'm sorry, I didn't mean to

25   cut you off.  Are you finished?

1      **A.   No, you're fine.**

2      Q.   We're -- and that was on November 11th, where he shared

3    that policy and offered that assistance to you?

4      **A.   I do remember him giving us the other handout that had**

5    **the student code of conduct.  I don't remember if I got this**

6    **that day or later, but I would, if I had to guess, I would say**

7    **yes, we got that this day, too.**

8      Q.   Okay.  And he was available to you at any time after

9    November 11th to explain the process if you had --

10               THE COURT:  I think we've covered that topic,

11    Mr. Ferguson.  Let's take a new one.

12               MR. FERGUSON:  All right.

13    BY MR. FERGUSON:

14      Q.   Would you turn in your exhibit notebook to Exhibit 400,

15    the first exhibit.

16      **A.   (The witness complies.)**

17      Q.   Would you tell the Court what that is.

18      **A.   This is my appeal letter that was dated on the 17th of**

19    **November.**

20      Q.   I'm sorry, I want to interrupt you, because I want you

21    to go back one page to 400, not 401.

22      **A.   Oh, excuse me.  I flipped too fast.  Oh, this is the**

23    **e-mail that I sent to Amber Delphia the night of November 10th,**

24    **or, well it says November 11th 'cause it was past midnight.**

25      Q.   And you sent that to her.  And what was the purpose of

1  you sending that?

2  **A.  As I said before, to offer her if there was anything I**

3  **could do on her behalf.**

4  Q.  You also apologized for your actions, did you not?

5  **A.  Yes, I did.**

6  Q.  And you acknowledged to Ms. Delphia at 12:57 a.m. on

7  November 11th, before meeting with Jeanne Walsh, that it was

8  obvious that you did not consider all aspects of your actions.

9  **A.  That is correct.**

10  Q.  And when you sent that e-mail, you knew that that

11  was -- that posting that picture on Facebook was a problem,

12  didn't you?

13  **A.  Yes, 'cause she told me to take it off.**

14  Q.  You went to great lengths in your e-mail to not only

15  apologize but explain the fact that you understood that there

16  was a lapse in your better judgment?

17            THE COURT:  I see it.  It's the second line.

18  **A.  Second line?  Yes, I did.**

19  Q.  Okay.  And in the third paragraph you praise Amber for

20  encouraging critical thinking skills in the classroom?

21  **A.  That's right.  She's a very good instructor.**

22  Q.  And you didn't have any complaints about her that

23  night, and you didn't say anything in the e-mail, did you,

24  about the fact that she had given you -- presumably given you

25  some permission earlier in the day to post the pictures on

1    Facebook?

2      **A.   Well, I didn't say that outright, but when I offered to**

3    **talk to -- on her defense, that that's what I was thinking when**

4    **I wrote that, because she did give us permission, which made me**

5    **think that maybe she's in trouble.**

6      Q.   I understand that you're saying that she gave you

7    permission, as you testify here today, but I'm asking you about

8    the e-mail you wrote at 12:57 a.m. on Thursday, November 11th.

9      **A.   Right.   When I wrote here "please let me know if**

10   **there's anything I can do or anyone to talk to on your behalf,"**

11   **what I was thinking was because you must be in trouble, because**

12   **Chrystie or Jamie had told me that she had been contacted by**

13   **the school.**

14     Q.   She had been contacted by the school already on the

15   evening of Wednesday, November 10th?

16     **A.   That was what I was led to believe.**

17     Q.   Okay.   And is it also possible that you were concerned

18   about Amber's position because something her students had done

19   might get her in trouble, and it wasn't the fact that she had

20   given you permission to do it, that you just were concerned

21   about your instructor?

22     **A.   Can you break that up?**

23     Q.   Sure.   I'm trying to understand how it is that later

24   you present the defense that Amber gave you permission, but you

25   didn't take that issue up with Amber when you sent her this

1    letter of apology after she told you to take the pictures down.

2    Where is it presented here, or how can we see what you -- that

3    there was some understanding on November 10th that she gave you

4    permission?

5        **A.   How can you see it here?  Is that what you're asking?**

6        Q.   Yeah.

7        **A.   I don't think you can from this e-mail.**

8        Q.   Okay.  If you'll turn then to the next page on 40 --

9    Exhibit No. 401.

10       **A.   (The witness complies.)  Now, this is my appeal letter**

11   **to Jeanne Walsh.**

12       Q.   Okay.  And that's your three-page letter where you once

13   again acknowledged your lack of professionalism and your poor

14   judgment and you apologize for your mistake?

15       **A.   Well, you have to understand that at the time I did**

16   **believe I was being professional, I was treating the placenta**

17   **with respect, and it was not my intent to be unprofessional,**

18   **which I think I do mention, and that it was a lapse in judgment**

19   **because I had not intended other people to interpret it in a**

20   **different way other than my excitement for what I was learning**

21   **about, as well as being unprofessional toward the school.**

22       Q.   But on November 17th you understood that others might

23   consider that to be unprofessional, and that's what you were

24   acknowledging, that your actions, even though you may have had

25   the best intentions, may have been perceived by others in a

1    different light?

2       A.   Yes.

3       Q.   And in the picture here up on the easel, you see that

4    it has Johnson County Community College on the lapel of the

5    scrubs, and you understand that that might have created some

6    anger or confusion or emotion in Jeanne Walsh, the fact that

7    that picture was out there?

8       A.   Yes.

9       Q.   Okay.  And in your picture, you posted some kind of a

10   text underneath the picture.  Do you remember what that was?

11      **A.   I did not post any text underneath my picture.  There**

12   **was a comment in regard to it that asked what is it.**

13      Q.   Okay.  Did you save the Facebook conversation or

14   discussion?

15      **A.   No, I did not.  But what I think to -- what you were**

16   **referring to is a separate thing, which was my Facebook status,**

17   **which had been updated far prior to me posting a picture, that**

18   **asked my Facebook friends if you could guess what I got to**

19   **touch today, I would take you out to lunch.**

20      Q.   Okay.  And explain to the Court, I'm sorry, how does

21   that appear on your Facebook?  Somebody else put it there?

22      **A.   Underneath the status, which is separate from the**

23   **photo.**

24      Q.   Okay.  And so on the Facebook you said, "Guess what I

25   touched today?  First one to get it right gets lunch with me."

1      A.   That's correct.

2      Q.   And that posting on your status was something that led

3  to an e-mail or a posting dialogue where others could then add

4  comments or post comments?

5      A.   That's right, they could guess.

6      Q.   And so there was quite a discussion on your Facebook

7  about what that was?

8      A.   Someone guessed a keyboard.

9      Q.   I'm sorry?

10     A.   Someone guessed a keyboard.

11     Q.   And so you understood that Jeanne didn't find all the

12  comments to be professional as well?

13     A.   I did not understand that from what she had told me on

14  November 11th.

15     Q.   And so while your posting of the picture might have

16  been in good intent, by you putting it out there it allowed

17  everybody else to put comments --

18             THE COURT:  I think we need a new topic.

19             MR. FERGUSON:  Okay.

20  BY MR. FERGUSON:

21     Q.   If you'll turn, please, to Exhibit 405.

22     A.   (The witness complies.)

23     Q.   This is a first page of a nursing student handbook.

24  Did you receive a nursing student handbook as part of your

25  program?

1    **A.   Yes.   Yes, I did.**

2    Q.   And, in fact, if you turn to Exhibit No. 409, that's

3    your receipt of the nursing student handbook on October 20th of

4    2010; is that right?

5    **A.   That is correct.**

6    Q.   So looking at Exhibit 405, if you'll turn with me to

7    the Mission Statement on page 1.

8    **A.   (The witness complies.)**

9    Q.   The second sentence of the mission statement says that

10   the nursing program "provides an environment that fosters

11   critical thinking, self-managed interactive learning and

12   effective communication to meet the changes and demands of the

13   health care community."

14          Do you agree that the nursing program does expect that

15   you have your own critical thinking and make decisions like

16   whether or not you should post a picture on Facebook and

17   whether or not it might reflect negatively on the college?

18   **A.   Can you restate that question?**

19          THE COURT:  I'm going to overrule that question as

20   leading.  I made an objection, I ruled on the objection, I

21   sustained the objection.

22          MR. FERGUSON:  You're the judge.

23          THE COURT:  That's what I get to do.

24   BY MR. FERGUSON:

25   Q.   Under the Philosophy on page 2, in the last paragraph

1    there, do you understand that part of the policies and

2    procedures that are set forth in the nursing student handbook

3    include the American Nursing Association Standards of Practice

4    and the National League of Nursing competencies as part of your

5    academics?

6        **A.   Yes.**

7        Q.   Is the clinical setting, is that an extension of the

8    classroom or another -- is that an alternative learning

9    environment?

10       **A.   Yes.**

11       Q.   At the time that the picture was taken, did you know

12   that this was a fresh placenta?

13       **A.   No, I did not.**

14       Q.   And one of the students came in that had been with the

15   patient.  Did you know that?  When did you find out?

16       **A.   Which patient?**

17       Q.   Well, the patient that that placenta belonged to.

18       **A.   I never knew that.**

19       Q.   Okay.  At what point did you find out that that was a

20   fresh placenta, meaning it was with -- it had been part of a

21   patient's C-section?

22       **A.   I'm guessing I'm finding it out right now.**

23       Q.   Okay.  When did you find out that you were going to get

24   a chance to examine a placenta on November 10th?

25       **A.   I believe it was before lunch.  I believe Chrystie**

1   **North told me that she had talked to Amber Delphia, and that we**

2   **were going to be examining a placenta after lunch.**

3   Q.   Okay.  So there wasn't a discussion with the entire

4   group as to having a unique opportunity that day because

5   somebody was having a C-section at the hospital?

6   **A.   No, not that I was aware of.**

7   Q.   Okay.  If you'll turn back to Exhibit 405, please, on

8   page 5, the Code of Conduct.

9   **A.   (The witness complies.)**

10   Q.   You received the Code of Conduct, correct?

11   **A.   That's correct.**

12   Q.   And the nursing code of conduct in the first sentence

13   says, "The Nursing faculty and administration believe that the

14   standards of professional practice must be maintained at all

15   times and in all settings."

16        Would you agree with me that that extends beyond the

17   classroom?

18   **A.   Yes, I would.**

19   Q.   And that extends beyond the clinical setting?

20   **A.   Yes.**

21   Q.   And that extends into conversation in hallways, on

22   campus, or any other place?

23   **A.   Yes.**

24   Q.   Would you agree that that also, that that professional

25   behavior that's required in the code of conduct, would also

1    extend to the Internet?

2         **A.   Yes.**

3         Q.   Okay.  And you accepted that.  And if you look at

4    Exhibit 407, you actually signed off on receiving the Code of

5    Conduct on August 18th of 2010.  Is that your signature there?

6         **A.   Yes, it is.**

7         Q.   So you accepted all of the terms of the code of

8    conduct, and you said that it's been reinforced and that you'll

9    accept this professional role and responsibility?

10        **A.   Yes, I did.**

11        Q.   And at the last paragraph before the bold, it says,

12   "Any inappropriate communication and/or behavior will not be

13   tolerated and will be documented as part of the Clinical Nurse

14   Progress Report evaluation form.  Further disciplinary action

15   such as probation or dismissal from the nursing program may

16   result from the disruptive or disrespectful behavior."

17             You understood at the time you entered the program that

18   if you engaged in behavior that was considered to be disruptive

19   or disrespectful, that you could, in fact, be dismissed from

20   the program; is that true?

21        **A.   Yes.**

22        Q.   On the next page, on page 12, it describes -- and once

23   again these are just excerpts from the policy, but the nursing

24   program outlines the promotion policy and explains --

25        **A.   I don't -- I've lost you.  You said the very next page,**

1   **page 12.**

2       Q.   We're on Exhibit 405, page 12.

3       **A.   I have a page 77.**

4               (Brief pause.)

5       **A.   Thank you.**

6               THE COURT:  Mr. Ferguson, you're welcome to read

7   through this book if you want, but all your testimony's got to

8   be in by 4:30 so I can have argument, so use your time as you

9   want.

10  BY MR. FERGUSON:

11      Q.   I'm going to ask you then to turn to page 406 --

12              THE COURT:  Exhibit 406?

13  BY MR. FERGUSON:

14      Q.   Exhibit 406.  It's titled the American Nurses

15  Association Code of Ethics For Nurses.  And have you seen that

16  document before?

17              MR. COHEN:  Well, I'm going to object on

18  relevancy.  None of these students were nurses.  They were

19  nursing students.

20              THE COURT:  Was this code of ethics for nurses

21  cited in any of their dismissal?

22              MR. FERGUSON:  It was cited in the policy in the

23  nursing handbook, which I was going through, and it is referred

24  to the standards of practice, code of ethics.

25              THE COURT:  All right, I'll overrule the

1    objection.

2    BY MR. FERGUSON:

3        Q.   Let me ask it this way.  You were -- Ms. Byrnes, you

4    were provided a copy of the Code of Ethics For Nurses as part

5    of your program, were you not?

6        **A.   I believe I did receive it at some time, yes.**

7        Q.   Okay.  And Exhibit 408, would you take a look at that,

8    Exhibit 408 is a confidentiality statement.  And you signed

9    having received the confidentiality statement?

10       **A.   That's correct.**

11       Q.   And the confidentiality states that you must

12   judiciously protect information of a confidential nature and

13   can expect ethical behavior in your participation in the

14   program?

15       **A.   Yep.**

16       Q.   And, in fact, you agree only to discuss confidential

17   information only in the clinical setting as it pertains to

18   patient care and not where it may be overheard by visitors

19   and/or other patients?

20       **A.   That is correct.**

21       Q.   And do you consider your Facebook page to be in a

22   clinical setting?

23       **A.   No, I do not.**

24       Q.   Now, when you met with Ms. Delphia in the soiled

25   utility room, she gave you permission to take the picture, but

1    you admit at that time she did not -- there was no discussion

2    as to what the picture was going to be used for.  Is that

3    right?

4        **A.   That's correct.**

5        Q.   And then in the -- according to your testimony, the

6    permission to post on Facebook came in the locker room?

7        **A.   That is correct.**

8        Q.   Now, was Ms. Delphia in the locker room with you and

9    the other students the entire time?

10       **A.   I believe so, yes.**

11       Q.   And did she specifically -- did you overhear her say

12   that it was okay to post those pictures on Facebook?

13       **A.   What I heard her say was, come up to Chrystie North,**

14   **and ask her, "Who are you planning to e-mail those pictures**

15   **to?"  Chrystie said, "I'm not planning to e-mail them to**

16   **anyone.  I'm going to put them on Facebook."  And she just**

17   **replied with, "Oh, you girls," and smiled.**

18       Q.   So do you have any idea if Amber Delphia knows anything

19   about posting pictures on Facebook or whether anyone else can

20   comment on it?

21       **A.   I would believe so because I recall in a different**

22   **clinical day her speaking with -- Amber Delphia speaking with**

23   **another nurse about Facebook and how you have to be careful**

24   **what you put on there.  I remember her talking to a friend she**

25   **had at the clinical site, one of the other nurses.**

 1    Q.  And she didn't specifically say it was okay to post it,

 2  but you assumed from the context --

 3              THE COURT:  You know, I've heard that question

 4  seven times.  I don't think an eighth's time's really going to

 5  have any impact on me, so let's find a new topic.

 6  BY MR. FERGUSON:

 7    Q.  On November 11th when you met with Ms. Walsh, you

 8  had -- you would agree that you had notice of the complaint

 9  against you, and that was that you had posted pictures and that

10  you had engaged in inappropriate conduct?  You understood that

11  at the time you met with her?

12    **A.  Afterwards, yes.**

13    Q.  After you -- what do you mean "afterwards," you

14  understood --

15    **A.  After the meeting.**

16    Q.  Was there anything left in your mind on November 11th

17  as to why you were meeting with her?

18    **A.  I'm sorry?**

19    Q.  Sure.  You said you knew that after you met with her.

20    **A.  Yes.**

21    Q.  What did you think the purpose of the meeting was?

22    **A.  I thought -- well, because I had told you before that I**

23  **had talked to Amber Delphia the night before when she asked me**

24  **to take the photo off, and I had asked her, "Are we in**

25  **trouble?" which I then referenced in that e-mail you showed.**

1   And she said no, so I didn't think we were in trouble.  I

2   thought maybe we were getting a reprimand.  I didn't know for

3   sure what we were going into.

4      Q.   And when you were in the meeting, when she said, "What

5   were you girls thinking?" you were given an opportunity to

6   explain yourself?

7      A.   I would not -- I would say that she asked that

8   question, but I didn't feel that we were given an opportunity

9   to explain ourselves without being cut off.

10     Q.   You made the decision at that point yourself not to

11  express your opinion, that she didn't tell you --

12     A.   Well, Jamie had said, "We had asked our clinical

13  instructor.  How could we be in so much trouble?"  And

14  immediately the reply was "Do not throw your instructor under

15  the bus."  So we stopped talking about that, 'cause they didn't

16  want to hear it, it was apparent to us.

17     Q.   And at that point there was at least some consideration

18  of options as to whether or not you'd have a W or an F?  She

19  didn't rule that out, the possibility that you might have a W?

20     A.   Yes, that's true.

21     Q.   All right.  And you were permitted to submit a letter

22  of apology on the 17th that had all of the details of the

23  incident and all of your explanation for her to consider?

24     A.   It was not a letter of apology.  It was an appeal

25  letter, so yes, I did submit an appeal letter on November 17th.

1    Q.  And you were upset because she didn't change her

2    opinion?

3    **A.  Was I upset that she didn't change her opinion about my**

4    **dismissal?  Yes, I would say I was upset about that.**

5    Q.  And did you -- is there -- strike that.  You had

6    further discussion then with Ms. Walsh at -- on November 22nd

7    where you discussed the options, and she indicated that she

8    would support readmission?

9    **A.  On November 22nd, was that before or after**

10   **Thanksgiving?**

11   Q.  That was the date that you met with her.

12   **A.  No, I don't remember being told that she would support**

13   **our admission.  Not until I had the official response that said**

14   **she was upholding her decision to dismiss me did I ever hear**

15   **that she would support our readmission.**

16   Q.  Okay.  And then in December you had the opportunity to

17   advance all of your concerns and criticisms of the process

18   through your attorney by submitting written documentation?

19   **A.  Yes.**

20   Q.  And he was present with you when you met with

21   Dr. Craig?

22   **A.  Yes, he was.**

23   Q.  And is there something that you were not provided at

24   that time that you think you should have been provided?

25   **A.  A hearing.**

1   Q.   And you didn't consider that to be a hearing, where you

2   were entitled to explain your position and have your position

3   known to Dr. Craig?

4   **A.   No, I do not, because we sat down and Dr. Craig asked**

5   **me a list of questions that she had typed out, and then she**

6   **gave me a -- she asked if I had any things to say, and I asked**

7   **that she would consider my -- what I had said about asking for**

8   **permission, as well as thanking her for having the chance to**

9   **actually not cut me off when I answered questions such as what**

10  **are you thinking.**

11              MR. FERGUSON:  In the interest of time, I'll move

12  on.

13              THE COURT:  All right, thank you.  You have no

14  time for redirect.

15              MR. COHEN:  No, no, I was getting up for my next

16  witness.

17              THE COURT:  You also don't have any time for

18  another witness.

19              MR. COHEN:  Judge.

20              THE COURT:  You can step down, Ms. Byrnes.

21              (Witness excused from the witness stand.)

22              THE COURT:  Counsel, I told you in advance not to

23  spend time discussing matters that were not disputed and that

24  we had until 5:00 o'clock, and you said I will use no more than

25  half the time.  It's almost 4:00, Mr. Cohen.  The plaintiff

1    rests.

2                We're going to take a ten-minute comfort recess so

3    my court reporter doesn't mutiny on me and then we'll come back

4    and we'll hear defendant's witnesses.  We'll reconvene at ten

5    minutes till four.

6                (A recess was taken from 3:48 to 3:55 p.m.)

7                COURTROOM DEPUTY:  All rise.

8                THE COURT:  You can be seated.

9                Mr. Cohen, you referred to Exhibits 14, 18 and 19

10   in your case.  Do you wish to admit those?

11               MR. COHEN:  Yes, Your Honor.

12               THE COURT:  Do you have any objection?

13               MR. FERGUSON:  14, 18 and 19, I looked at those,

14   and there are no objection.

15               THE COURT:  All right.  They're going to be

16   admitted.

17               MR. FERGUSON:  I guess at this point I'd just make

18   an oral request for a directed verdict on the request for

19   temporary injunction, that he hasn't met his burden under the

20   requirements.

21               THE COURT:  Your request will be received.  I'm

22   not sure it really is appropriate in a TRO hearing but we'll

23   take the argument later.  To the extent you need a procedural

24   thing preserved, it's preserved.

25               MR. FERGUSON:  The defendants would call Amber

 1    Delphia.

 2                        AMBER DELPHIA,

 3    having been first duly sworn to testify the truth, the whole

 4    truth, and nothing but the truth, testified as follows:

 5                     DIRECT EXAMINATION

 6    BY MR. FERGUSON:

 7        Q.   State your name.

 8        **A.   I am Amber Delphia.**

 9        Q.   Ms. Delphia, did you submit a detailed affidavit

10    regarding the facts and circumstances of this situation?

11        **A.   Yes.**

12        Q.   And is that your signed affidavit at Exhibit 410?

13        **A.   Yes.**

14        Q.   Okay.  I'm going to avoid going through each of those

15    paragraphs, but I know that there were a couple points where

16    you disagreed or your testimony is different than that of the

17    students.

18             On the morning of November 10th, in the soiled utility

19    room, you understood that the students were requesting

20    opportunity to take a picture of the placenta.

21        **A.   Yes.**

22        Q.   And can you explain to the judge how that kind of

23    unfolded and what your view of it was at that time.

24        **A.   Well, they had requested to take a picture, and I kind**

25    **of gave a gesture of uncertainty to Chrystie.  That was the one**

1    that was requesting to take the picture.  And then -- but they

2    still requested they wanted to take pictures, and so I did make

3    the statement about let's make sure there's no patient

4    information to avoid a HIPAA violation.

5        Q.   You weren't completely comfortable with the request in

6    the first place, were you?

7        A.   No, I felt pretty uneasy during the whole thing.

8        Q.   And the nursing students were persistent in asking?

9        A.   Yes.

10       Q.   And did you feel like that you did go ahead and let

11   them as long as there wasn't any --

12              MR. COHEN:  Well, Your Honor, I'm going to object

13   to leading the witness.

14              THE COURT:  I'm going to allow leading questions

15   in the interests of time.  Your objection's overruled.

16   BY MR. FERGUSON:

17       Q.   Go ahead and answer.

18       A.   I'm sorry, ask the question again, please.

19       Q.   Yes.  Did you feel like they were being persistent and

20   you ultimately permitted them to take that picture?

21       A.   Yes, because I did not say no, don't take it, so I

22   guess that's permission.

23       Q.   And you felt like they had at least responded to your

24   concerns about removing any personally identifiable information

25   at that time?

1-6-11 BYRNES v. JCCC, et al.   10-2690

108

1    **A.   Yes.**

2    Q.   Did you give any permission at that point to post the

3    pictures on Facebook or do anything with them?

4    **A.   No.  No.**

5    Q.   Okay.  Now, the testimony's been given that an exchange

6    occurred in the locker room shortly after that when there was a

7    conversation about posting pictures on Facebook.  Do you recall

8    that conversation occurring on the date in question, on

9    November 10th?

10    **A.   I do not recall that conversation.**

11    Q.   And were you with the girls in the soiled utility room

12    the whole time?  And I'm taking you back to the previous

13    incident.

14    **A.   Well, I came in, I was getting other students so that**

15    **they could examine the placenta.**

16    Q.   And then when you moved to the locker room, were you

17    with the students the entire time?

18    **A.   Yeah, we were all in there together gathering up our**

19    **stuff.**

20    Q.   So you were -- you weren't in the teaching moment where

21    you were --

22    **A.   No.**

23    Q.   -- describing anything to them; it was just moving

24    around generally in the locker room?

25    **A.   Correct.**

1    Q.   And do you recall ever asking what they were going to

2    do with the pictures?

3    **A.   I don't.**

4    Q.   And the testimony has been stated that you asked what

5    are you -- are you going to e-mail those pictures, and that a

6    specific statement was made to you by the nursing students that

7    they were going to post that on Facebook.

8    **A.   I do not recall that.**

9    Q.   Okay.  If that had come up, would that have created an

10   issue for you or would you have remembered that that was

11   stated --

12   **A.   Yes.**

13   Q.   -- in such a way?  Why?

14   **A.   Because I would have never given permission to someone**

15   **to place anything like that on Facebook.**

16   Q.   Is that --

17   **A.   Or any social media.**

18   Q.   Is that consistent with your earlier general discomfort

19   that --

20   **A.   Yes.**

21   Q.   -- from -- in the soiled utility room, when you were

22   asked to take pictures in the first place, you were -- the

23   whole thing was just a little uncomfortable to you?

24   **A.   Yes.**

25   Q.   Okay.  So if -- you're telling the Court that if you

1   had been told that the nurses were going to post that on

2   Facebook, you would have stated an objection and told them not

3   to do that?

4       **A.  Correct.**

5       Q.  Now, when you were alerted to the fact that there was a

6   concern about these pictures being posted on Facebook that

7   night when you got an e-mail, you connected the dots and

8   realized that that was your group?

9       **A.  My group.**

10      Q.  That's your group?

11      **A.  Yes.**

12      Q.  And that's what occurred from earlier in the day?

13      **A.  Yes.**

14      Q.  Did anybody tell you to call everybody in your class

15  and tell you to remove the pictures from Facebook?

16      **A.  No.**

17      Q.  You didn't need anybody to tell you to do that, did

18  you?

19      **A.  No.**

20      Q.  Because on your own you considered that to be

21  problematic?

22      **A.  Yes.**

23      Q.  You didn't consider that to be an appropriate use of

24  those pictures that had been taken of the placenta earlier in

25  the day?

1    A.   Correct.

2    Q.   So you weren't told by Jeanne Walsh or anyone else; you

3    just knew on your own to call them and tell them to take those

4    down?

5    A.   Correct.

6    Q.   Now, testimony's been provided by Doyle Byrnes that

7    when you called her she said, "Am I in trouble?"  Do you

8    remember her asking that question?

9    A.   Yes.

10   Q.   What was your answer to that question?

11   A.   I said, "I don't know."

12   Q.   And she's testified that you specifically said no.  Is

13   that -- is it true that you said "I don't know," or that you

14   said "No"?

15   A.   I said, "I don't know."  Because at that time I really

16   didn't know what was going on.  I didn't know what their

17   discipline or anything would be in that situation.

18   Q.   Because you hadn't talked to Jeanne or Dr. Craig; you

19   just simply saw the e-mail where there were some other students

20   who had complained or raised the question about whether or not

21   it was appropriate?

22   A.   Correct.

23   Q.   So would it be consistent that you would have told

24   Doyle Byrnes that she was not in trouble if you didn't know

25   what the position would be of Jeanne or anybody else?

1    A.   I would not have told her no unless I knew that for

2    sure.

3    Q.   You received e-mail notes of apology from at least

4    three of the nursing students that night or the early morning

5    of November 11th, did you not?

6    A.   Yes.

7    Q.   Did any of them raise the question or put you on notice

8    at that time that they were taking the position that you had

9    given them consent to post those on Facebook?

10   A.   No, they did not.

11   Q.   I'm sorry?

12   A.   I'm sorry, repeat the question.  I didn't hear.

13   Q.   I'm wanting you to tell the Court, as to the e-mails

14   you received in the evening of November 10th or the morning,

15   early morning hours, of November 11th, if any of the e-mails

16   that came to you from the nursing students expressed anything

17   about apology.

18   A.   That was all they expressed, was apology.

19   Q.   Did they question you or make a statement that took a

20   position that you had, in fact, given them permission to post

21   these pictures on Facebook?

22   A.   No.

23   Q.   In your preconference discussion, had you informed the

24   students that this was a fresh placenta?

25   A.   I knew that because I was told that when I asked

1   permission to examine one, they told me, well, we have a fresh

2   one that's going to be -- that can be used, instead of using an

3   older one.  And I'm not sure if I expressed that to the

4   students or not, but I knew that knowledge.

5      Q.  And in the soiled utility room somebody asked you if

6   they could start an IV on the placenta; is that right?

7      A.  Correct.

8      Q.  And what was your response?

9      A.  Absolutely not.

10     Q.  And why was it important that you not start an IV on

11  this human tissue at that time?

12     A.  Because I didn't want to mess with the integrity of the

13  placenta, in case it needed to be used for pathology or other

14  reasons.

15     Q.  Okay.  So this was different than if you had taken

16  human tissue from the freezer and did some laboratory

17  examination, because this still had some potential medical

18  utility at that point?

19     A.  It could, yes.

20     Q.  And you just simply didn't know, so you weren't going

21  to let them --

22     A.  Right.

23     Q.  -- contaminate it in any way?

24     A.  Correct.

25     Q.  And you explained that to the students at the time?

1-6-11 BYRNES v. JCCC, et al.   10-2690

1      **A.   Yes.**

2              MR. FERGUSON:  That's all I have for this witness.

3              THE COURT:  Mr. Cohen, because you've used the

4      lion's share of your time, I'm going to give you two to three

5      minutes for cross-examination, so hit your key points.

6              MR. COHEN:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8      BY MR. COHEN:

9      Q.   Ms. Delphia, consistent with your affidavit, it appears

10     you're saying that you did give permission for the photos, yes?

11     **A.   I never said yes, take them.  But I did not say don't**

12     **take them.  So that's permission.**

13     Q.   Well, I want to quibble with you.  You signed, under

14     oath, your affidavit.

15     **A.   Uh-huh.**

16     Q.   Item No. 7, tell this Court if it's true or false, "I

17     reluctantly permitted the students to take the pictures."

18             MR. FERGUSON:  Your Honor, we've stipulated that

19     fact.

20             THE COURT:  Well, she just denied it.  I think

21     he's entitled to inquire of that.

22     **A.   Well, yes, then I gave permission by not saying don't.**

23     Q.   And now you're telling the Court that after granting

24     permission you had no curiosity as to what would happen to

25     these photos, you didn't ask what they were going to do with

1   them, there was no discussion in the locker room.  You deny all

2   of the testimony that you heard today and apparently didn't

3   care what they were going to do with the pictures; is that

4   about it?

5       **A.   It's not that I didn't care.**

6       Q.   Well, you didn't express any concern, did you?

7       **A.   No.**

8               MR. COHEN:  I'm done.  Thank you.

9                       REDIRECT EXAMINATION

10  BY MR. FERGUSON:

11      Q.   Mr. Cohen said you didn't express any concern.  You

12  obviously expressed concern about the fact that there was not

13  going to be any personally identifiable information in the

14  pictures?

15      **A.   Correct.**

16      Q.   And so it's not that you didn't believe that you didn't

17  express any concern, you just didn't have any knowledge that

18  they intended to post those on Facebook; isn't that true?

19      **A.   Right.**

20              THE COURT:  Thank you, ma'am.  You may step down.

21              (Witness excused from the witness stand.)

22              THE COURT:  Call your next witness.

23              MR. FERGUSON:  Jeanne Walsh.

24                      JEANNE WALSH,

25  having been first duly sworn to testify the truth, the whole

1  truth, and nothing but the truth, testified as follows:

2          MR. COHEN: Your Honor, if you would just permit

3  me a request to note that we have 22 minutes left, and in

4  fairness, I need time to cross-examine this witness.

5          THE COURT: Well, I guess you should have thought

6  of that earlier, shouldn't you?

7                       DIRECT EXAMINATION

8  BY MR. FERGUSON:

9      Q.  Please state your name.

10     **A.  My name is Jeanne Walsh.**

11     Q.  Ms. Walsh, did you provide a signed affidavit which is

12  included in the exhibit notebook at Exhibit 412?

13     **A.  I did.**

14     Q.  Is that your signature on page 7?

15     **A.  Yes, it is.**

16     Q.  And are those all of the factual statements that you've

17  made related to this incident?

18     **A.  That is correct.**

19     Q.  Just so the Court understands, how long have you been a

20  licensed registered nurse?

21     **A.  Since 1971.**

22     Q.  And how many years have you been in the nursing

23  profession as a teacher?

24     **A.  Since 1974, a long time.**

25     Q.  And I understand you are on the State Board of Nursing;

1-6-11 BYRNES v. JCCC, et al. 10-2690

117

1   is that right?

2       **A.   That is correct, I'm president.**

3       Q.   As president.  How long have you been in that position?

4       **A.   I'm on my second four-year appointment and my fifth**

5   **year.**

6       Q.   And you love nursing, don't you?

7       **A.   Yes, you could -- yes.**

8       Q.   Tell the Court what was going through your mind or what

9   you felt was wrong about the Facebook postings, the pictures

10  that we've talked about here today.  When you saw those on

11  Facebook, what went through your mind?

12      **A.   Well, I don't get on Facebook, so I had received -- the**

13  **pictures had been downloaded to me, to my computer at home.  I**

14  **just want you to know I do love what I do.**

15      Q.   I understand you're trying very hard not to cry because

16  you want to give your testimony rather than cry, but it's okay.

17  Do the best you can, provide information.

18      **A.   Thank you.  When I saw the pictures, I could not**

19  **believe how the students were posing.  And the only thing I can**

20  **tell you is that it was -- I felt it was a total disregard for**

21  **the dignity and sanctity of the relationship we have with our**

22  **patients.**

23      Q.   As -- I'm sorry, if you're not finished, please

24  continue.

25      **A.   I uphold the code of ethics in every part of my life,**

1  **which of course includes my position.  My school is viewed as**

2  **one of the best for 22 years when I came back in 1999 --**

3  　　　　　　THE COURT:  Ms. Walsh, I don't want to be

4  insensitive, but given the hour, you really need to limit your

5  comments to what's at issue in this case.

6  　　　　　　THE WITNESS:  I'm sorry.  But, Your Honor, the

7  issue is that it broke my heart when I saw these.

8  　　　　　　THE COURT:  With all due respect, that is not the

9  issue.  The issue is whether the students posting this picture

10  was such an egregious violation of your printed code of conduct

11  to warrant their dismissal from the school.

12  　　　　　　THE WITNESS:  Yes.

13  　　　　　　THE COURT:  That's the issue.  And that's what you

14  need to limit your comments to, ma'am.

15  BY MR. FERGUSON:

16  　Q.  And let's shift then, if I can, Ms. Walsh, from your

17  emotional feeling at that moment to what your concern was, and

18  you've described that in paragraph 12 of your affidavit.  And

19  maybe it would help to focus on your written word there, that

20  you had some concerns about the impact that that picture might

21  have.

22  　**A.  Absolutely.**

23  　Q.  And tell the Court the various ways in which that --

24  that that posting wasn't just an emotional reaction but you

25  were concerned about the impact that picture would have.

1   A.   Well, I was first worried about the impact it might

2   have on the patient, that I had found out it was the only

3   delivery on this particular day, so I was afraid it might be

4   tracked back to the patient.

5   Q.   Okay.

6   A.   The students were identified with their uniform with

7   their patch (indicating), so that people knew they were from

8   our program.  And I was concerned about, first of all, what my

9   colleagues and the rest of the nursing community and even the

10  community of nursing would think that our students were

11  disregarding the therapeutic relationship we have with our

12  patients.

13  Q.   In your mind, Ms. Walsh, the patient relationship

14  doesn't just end in the room when you're with the patient,

15  right?

16  A.   No, sir, that is correct.

17  Q.   You believe that it extends beyond, and so this was an

18  extension of the patient/nurse relationship when they were

19  examining the organ that had been removed from the patient; is

20  that your feeling?

21  A.   That is correct.

22  Q.   And you -- you understand -- or is it your testimony

23  that you first found out about this through your colleague, but

24  that the concern was raised by other students from the nursing

25  program?

1     A.   That is correct.

2     Q.   So did that play a part that other students had at

3  least raised the question as to whether this was appropriate in

4  the first place, and that caused you concern as well?

5     A.   Yes, it did.

6     Q.   And talk -- explain to the Court a little bit about the

7  importance of the Olathe Medical Center relationship on the

8  clinical programs.

9     **A.   Well, with all of our -- the clinical sites are all**

10  **very close partners with our nursing program.  Without the**

11  **clinical sites, then we have no place to have clinicals.  We**

12  **are one of the few schools -- I think really there are only two**

13  **schools there, but I -- who are allowed to use their OB unit.**

14     Q.   Was it a concern for you that if somebody at the Olathe

15  Medical Center saw this posting and made the connection about

16  the students who had been there and that day who had been part

17  of this cesarean section and posted that, that they would have

18  a negative reaction?

19     **A.   Absolutely.**

20     Q.   And you have a day-to-day contact with administrators

21  at Olathe Medical Center, don't you?

22     **A.   Perhaps not day to day, but --**

23     Q.   Well, as it relates to this specific incident, did you

24  have the opportunity to talk with one of the Olathe Medical

25  Center people who expressed significant concern about this?

1     **A.   Yes.**

2     Q.   And who was that?

3     **A.   I spoke with Elaine Patton, who is the --**

4            MR. COHEN:   Well, that's hearsay, Your Honor.

5            THE COURT:   It is.

6     BY MR. FERGUSON:

7     Q.   Okay.   Did you learn -- did -- at some point did you --

8     was your fear confirmed that Olathe Medical Center would not

9     want these students assigned to their clinical?

10           MR. COHEN:   Well, that calls for hearsay as well.

11           THE COURT:   It does.

12    BY MR. FERGUSON:

13    Q.   Were there any other concerns that you had about the

14    impact or the potential negative impact of these postings?

15    **A.   Yes, on future nurses who are interested in our**

16    **program.**

17    Q.   And how?

18    **A.   Who might have seen the Facebook postings or heard**

19    **about what had happened.**

20    Q.   And you said you're not part of Facebook, but you were

21    provided the commentary that was part of the Facebook posting?

22    **A.   Yes.**

23    Q.   And did you also find that dialogue to be disruptive or

24    lacking in significant professional behavior?

25    **A.   Yes, I did.**

1    Q.   And you gave, as the formal statement of the reason for

2    the dismissal, as the fact that the demeanor and lack of

3    professional behavior surrounding the event was considered a

4    disruption to the learning environment and did not exemplify

5    the professional behavior that you expect of the nursing

6    program.  Is that your belief as to what those pictures and the

7    comments, the impact of those?

8    **A.   Yes.**

9    Q.   And since other students raised that concern and

10   brought that to your attention, do you think that these

11   postings on the environment were a disruption to the learning

12   environment?

13   **A.   Yes, I do.**

14   Q.   Now, you met with these students on Friday,

15   November 11th, and it's been described that you were very angry

16   and that you were yelling at the students.  Can you tell the

17   judge how you would characterize the meeting.

18   **A.   Your Honor, I was very upset.  At the time I'm not even**

19   **sure whether it was more anger than disappointment and the fact**

20   **of wondering what effect this could have on the program and on**

21   **nursing.**

22   **When I asked the students -- I'd asked my secretary to**

23   **call them.  They apparently had come early, and they came to my**

24   **door.  Doyle was first.  And as she came in, she was almost**

25   **giggling.  It was a -- as if it wasn't a serious moment.  I had**

1   chairs for them in front of my desk.  I had Mrs. LaMartina in

2   the office with me because she helps with day-to-day duties

3   with my additional load with State Board of Nursing, and,

4   therefore, I wanted her informed on the issue.

5       Q.   Did you give them the opportunity to fully explain

6   themselves to you on that day?

7       A.   I asked them, "What were you thinking?"

8       Q.   And did you cut them off or prevent them from answering

9   that question?

10      A.   Doyle did most of the talking for the group.  She was

11  very apologetic, kept repeating that they took full

12  responsibility for what they had done, and, you know, just

13  continued that -- some of the same things you've heard today,

14  of Amber was the best instructor they had had, they had done

15  more with her.  There were definitely times for them to ask

16  questions.

17          In fact, Chrystie had asked me, "Are you going to let

18  us back in the program?"  And I said, "I am not sure."  And I

19  said, "Right now I am not sure I want any of you back."  And,

20  in fact, she said, "I knew this was wrong because my mother had

21  told me I shouldn't do this."  Dani --

22      Q.   The specific question that I asked you, though --

23      A.   I'm sorry.

24      Q.   -- is did you prevent them from answering any of your

25  questions or sharing their views.

1      A.   There was one point where Jamie did start to say -- and

2   she even got out of her mouth that Amber had given them

3   permission to take the pictures.  And I said, "She didn't give

4   you permission to publish them."

5      Q.   Okay.  Do you, as part of your nursing curriculum,

6   teach and encourage independent critical thought as part of the

7   nursing process?

8      A.   Absolutely.

9      Q.   And is that important?

10     A.   Absolutely.  But we also very strongly emphasize the

11  standards of practice, the code of ethics.  We begin that in

12  the very first semester.

13     Q.   And did you consider that -- or did you believe, even

14  if Amber had given that permission, which the college doesn't

15  admit, but if she had given that permission, that this is

16  something they should have known on their own not to do?

17     A.   I would have still found it, as I did, offensive.

18     Q.   In the short time we have, would you tell the Court a

19  little bit about the nursing program.  Is the OB clinical only

20  available in the fall semester?

21     A.   That is correct.

22     Q.   So the next time that the clinic would be available

23  would be the fall of 2011?

24     A.   That is correct.

25     Q.   And through the appeal process, you modified your

1   findings a little bit in that -- a couple of things.  You

2   supported -- you let them know that you would support

3   readmission?

4      A.   That is correct.  Well, I must tell you that Doyle was

5   waiting on me when I got to the office.  I had told them before

6   Thanksgiving that I would try to have the letters, my

7   decisions, given to them on Monday.  I didn't have the letter

8   ready until Tuesday.  She was waiting on me upon my arrival.

9           When she came in, she was very noncommunicative.  I

10   gave her a hug, asked her to sit down.  And she asked very

11   little when I -- I asked her if she wanted me to tell her what

12   was in the letter or have her open it.

13      Q.   But the end result of the process that you went through

14   was that you told her that you would support their efforts to

15   be readmitted?

16      A.   Yes.

17      Q.   Okay.  You did -- even though on November 11th you

18   weren't entirely sure whether it was an F or a W, during the

19   process of hearing what they had to say you communicated that

20   ultimately you decided that they would be given a W instead of

21   an F?

22      A.   Absolutely.

23      Q.   And an F would have been a terminal event, would it not

24   have?

25      A.   That is correct.

1-6-11 BYRNES v. JCCC, et al.  10-2690

1    Q.   Because then they couldn't have continued, they would

2    have been -- they would not have received a passing grade and

3    they couldn't have continued in the program?

4    **A.   Well, if they don't pass clinical, which this was a**

5    **clinical failure, they would get a D or an F in the entire**

6    **number of credit hours.   A withdraw does not affect their**

7    **G.P.A.**

8    Q.   So if they went through the readmission as you

9    proposed, the W would not have been a problem on their academic

10   record?

11   **A.   No.**

12   Q.   Okay.   And at least for three of the girls you

13   specifically talked to them about this ethics plan that you had

14   for -- as a term of readmission.   Why didn't you talk to Doyle

15   Byrnes about that?

16   **A.   She stood up and was -- and left.   She asked me no**

17   **questions.**

18   Q.   Okay.

19   **A.   And also Dani, Dani came in at the last and she said,**

20   **"You don't have to tell me anything.   I've already heard it**

21   **from the other girls."**

22   Q.   And on November 11th, did you refer the nursing

23   students to Dennis Day so he could go over their appeal

24   procedure and their appeal rights with them?

25   **A.   Absolutely.**

1          MR. FERGUSON:  That's all I have.

2          THE COURT:  Five minutes.

3                    CROSS-EXAMINATION

4    BY MR. COHEN:

5    Q.  I'd like you to tell the Court about the meeting in the

6    lecture hall that occurred November 15th, 2010, where you

7    introduced Dr. Clarissa Craig and said to the students, "I want

8    you to listen to her."  What was that about?

9    **A.  At that point I was very concerned about the class**

10   **itself.  In fact, all of the classes, first year and second**

11   **year.  I was fearful of rumors, speculation as to why four**

12   **students were gone from their class.  And I felt that if it**

13   **had -- I wanted them to know that it was a confidential matter.**

14   Q.  All right.  Let me ask you specifically.

15   **A.  Uh-huh.**

16   Q.  Did Dr. Craig, in your presence, say to those students,

17   November 15th, "Last week there was inappropriate pictures

18   taken in a clinical setting and they were posted to a social

19   network"?

20   **A.  Yes, I believe we did say that.**

21   Q.  All right.  Next did Dr. Craig say, in your presence,

22   "This is considered to be disruptive behavior to the learning

23   environment and very unprofessional, and not what we expect of

24   students in our nursing program"?

25   **A.  Yes, we did.**

1    Q.  And so having publicly condemned Doyle Byrnes'

2    behavior, did it seem to you appropriate that Dr. Craig should

3    be the appeal officer to hear Doyle's appeal?

4        **A.  Well, sir, she had -- there were three or four levels**

5    **of appeal.**

6                THE COURT:  Can you answer the question, please.

7                THE WITNESS:  Could you repeat it again?

8    BY MR. COHEN:

9        Q.  Given that Dr. Craig had publicly condemned Doyle's

10   conduct, right in front of you and in front of all those

11   students, did you think it was appropriate that three weeks

12   later she would be the sole appeal officer to decide Doyle's

13   appeal?

14       **A.  Well, first of all, she wasn't the sole appeal officer,**

15   **but at that time I have no reason to believe that Dr. Craig**

16   **would not be fair.**

17       Q.  You do agree that nothing in the college code of

18   conduct or the nursing school code of conduct says one direct

19   word about photographs, correct?

20       **A.  Oh, no, sir, it appears in the College Nurse Educators**

21   **Clinical Orientation Manuel.**

22                THE REPORTER:  I'm sorry, College Nurse?

23       Q.  Well, ma'am, pardon me --

24                THE COURT:  Let the court reporter get the

25   testimony.

1    **A.    College Nurse Educators Clinical Orientation Manual.**

2    Q.    I'd ask you to listen more carefully to my question.

3  With regard to the Johnson County Community College code of

4  conduct and regard to the nursing school code of conduct, do

5  you agree that there is not one word about photographs?

6    **A.    I don't think that's correct, sir.**

7    Q.    Well, you've got the exhibits in front of you.  Would

8  you like to show the Court where the school code of conduct or

9  the nursing school code of conduct addresses students taking

10  photographs or any use of photographs?

11    **A.    Well, the code of conduct of nurses, and that includes**

12  **Johnson County Community College, is included, and part of that**

13  **is the orientation manual that was developed by the deans and**

14  **directors of all of the schools in the metropolitan area.  And**

15  **it does -- and all of our students have that, and they sign**

16  **that they have it.**

17    Q.    That's really not the question I'm asking you.

18    **A.    I'm telling you that that is part of our code of**

19  **ethics.  That's part of learning what the ethics, both the**

20  **moral, the sanctity is of the code of ethics.**

21    Q.    Ms. Walsh, the nursing code of ethics is Exhibit 13.

22  You have it in front of you.  This is the code of conduct that

23  you relied on in your dismissal letter, correct?

24    **A.    Yes, because it was disruptive behavior.**

25    Q.    All right.  Tell me where in that code of conduct a

1  student or anybody else could read that the taking of

2  photographs is prohibited?

3    **A.   Sir, I don't believe as nursing we can ever have**

4  **everything listed that they are or are not to do.  That's part**

5  **of what people bring their moral standards, their values.  They**

6  **bring that to us, into the program, and what they don't know we**

7  **try to teach them.**

8         **We teach them therapeutic communication.  We teach them**

9  **honor.  We teach them respect of our patients and of our**

10  **community and our college.  And I do believe that that is it.**

11               MR. COHEN:  Judge, I'm done.  Thank you.

12               THE COURT:  Thank you.  Thank you, ma'am.

13               THE WITNESS:  Thank you.

14               THE COURT:  You may step down.

15                    REDIRECT EXAMINATION

16  BY MR. FERGUSON:

17    Q.  Ms. Walsh, in the meeting that Mr. Cohen referred to,

18  where he said that you publicly condemned Byrnes' behavior, you

19  made a very conscious effort not to mention Byrnes or anybody

20  by name, did you?

21    **A.   Oh, my goodness, there were several days my faculty had**

22  **no idea even who the students were.**

23    Q.  And the purpose of that meeting was to make sure that

24  no other students made the same mistake; isn't that right?

25    **A.   And I also didn't want them --**

1    Q.   Just yes or no.

2    **A.   Yes.**

3    Q.   And the code of conduct that's we've referred to

4    discusses the professional practice must be maintained at all

5    times and in all settings.  Isn't that comprehensive of taking

6    pictures or posting those on Internet?

7    **A.   That is correct.**

8              MR. FERGUSON:  Okay, thank you.  That's it.

9              THE COURT:  You can step down now.

10             THE WITNESS:  Thank you.

11             (Witness excused from the witness stand.)

12             THE COURT:  Who's your next witness?

13             MR. FERGUSON:  Dr. Dennis Day.

14                      DR. DENNIS DAY,

15   having been first duly sworn to testify the truth, the whole

16   truth, and nothing but the truth, testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. FERGUSON:

19   Q.   Please state your name?

20   **A.   Dennis Day.**

21   Q.   Would you turn to the exhibit notebook at Exhibit 418

22   and advise the Court if that's your signed affidavit.

23   **A.   It is.**

24   Q.   And Mr. Day or Dr. Day, what is your position with the

25   college?

1    **A.   Vice-President of Student Services.**

2    Q.   In that capacity are you commonly the administrator who

3    deals with student appeals, both in academic and disciplinary

4    nature?

5    **A.   Yes.**

6    Q.   And is the issue involving Doyle Byrnes, in your

7    professional opinion, an academic appeal?

8    **A.   Absolutely.**

9    Q.   And why did you determine on November 11th that this

10   was an academic appeal?

11   **A.   It was within the extended classroom setting during a**

12   **clinical site, and it happened outside of what we would call a**

13   **classroom setting, in a dirty room, and the decision was within**

14   **the nursing program and the protocol within the nursing**

15   **program.**

16   Q.   And so because it involved codes of conduct, policies

17   and procedures from the -- from the nursing program and

18   specific learning tools, that that was considered to be

19   academic and not disciplinary?

20   **A.   Correct.**

21   Q.   Okay.  And would you just briefly, so the Court -- we

22   can get this into the evidence, Exhibits 419 through 423, are

23   those the college policies that apply to this situation?

24   **A.   419 is the student code of conduct, and 423 --**

25   Q.   While you're on that, 419, you showed that to Doyle

1  Byrnes and others when she was in your office, when they were

2  in your office?

3      A.   **We talked about it when the three students were in my**

4  **office.  We talked about -- because at that point I didn't have**

5  **anything in writing from anybody to know exactly what was going**

6  **on, so I surmised that it was disruptive behavior.**

7      Q.   Okay.  And so you did talk with them about this

8  particular policy?

9      A.   **Correct.**

10     Q.   And did you talk with them about generally what the

11  academic appeal process would entail?

12     A.   **Correct.  And then I had copies of it printed off for**

13  **them and handed it out before they left the office area.**

14     Q.   And so Exhibit 421 is the student academic appeals

15  process, and it's Policy No. 319.03.  Is that what you would

16  have presented to them?

17     A.   **Correct.**

18     Q.   So is there any doubt in your mind on November 11th

19  that this was, at least as you saw it on behalf of the college,

20  that this was an academic appeal issue?

21     A.   **I had no doubt in my mind.**

22     Q.   Did you offer to provide assistance along the way if

23  the students ever needed any -- had any questions about the

24  procedures?

25     A.   **I did.  I offered to avail myself of any counsel or**

1   **help them understand the process at any point in time.**

2       Q.  At one point did you receive information from another

3   student that they had been contacted by --

4               MR. COHEN:  Well, that calls for hearsay, Your

5   Honor.

6               THE COURT:  He's right.

7   BY MR. FERGUSON:

8       Q.  Are there policies and procedures in both the nursing

9   code -- or the nursing handbook and the college policies with

10  regard to use of electronic devices?

11      **A.  Yes, in the student code of conduct there's one about**

12  **electronic devices, and they're not to be used inappropriately**

13  **in a classroom setting.**

14      Q.  And so --

15      **A.  It's Item No. 11 in the code of conduct.**

16      Q.  So there is, at least in the student code of conduct, a

17  specific policy on the use of electronic devices and phones?

18      **A.  Correct.**

19      Q.  And in the nursing handbook, you're aware that it

20  applies the code of conduct in all places and all settings?

21      **A.  Correct.**

22      Q.  And that would include the Internet?

23      **A.  Within the nursing program, yes.**

24      Q.  And you --

25              MR. FERGUSON:  That's all I have.  Thank you.

 1              THE COURT:  Mr. Cohen, you don't need to

 2    cross-examine this witness.  Trust me on this.

 3              MR. COHEN:  Thank you.

 4              THE COURT:  Call your next witness.

 5              MR. FERGUSON:  Can I ask one follow up?

 6              THE COURT:  No, you can't.  You finished your

 7    examination.  There was no cross-examination.

 8              You may step down.

 9              THE WITNESS:  Thanks.

10              (Witness excused from the witness stand.)

11              MR. FERGUSON:  Dr. Craig.

12                    DR. CLARISSA CRAIG,

13    having been first duly sworn to testify the truth, the whole

14    truth, and nothing but the truth, testified as follows:

15                    DIRECT EXAMINATION

16    BY MR. FERGUSON:

17    Q.  Dr. Craig, please state your name.

18    **A.  Clarissa Craig.**

19    Q.  Ms. Craig, at Exhibit 414, is that your sworn

20    affidavit?

21    **A.  Yes.**

22    Q.  I want to talk first about the meeting that occurred

23    that was described here about a public condemning of the

24    behavior.  Is there any discussion of Doyle Byrnes' name or any

25    other students in that meeting?

1    A.   No.

2    Q.   What was the principal purpose of that meeting?

3    A.   **Really, as Jeanne had indicated, it was -- we were**

4  **concerned about the student groups and what they were becoming**

5  **aware of, what they knew, and what their response would be to**

6  **what they would learn about the situation.**

7        **We also wanted to inform them, make them aware, that it**

8  **was considered unprofessional, and also make them aware that**

9  **they had a responsibility to not fuel gossip and speculation**

10 **about what may have transpired, and to squelch that if it was**

11 **to arise.**

12   Q.   Was there also concern related to the facility that's

13 involved?

14   A.   **Yes, there was.  I'm not sure that we addressed that**

15 **during that presentation, however.**

16   Q.   Okay.  And so the purpose of that meeting was to

17 prevent this from happening to anyone else or from anybody

18 else?

19   A.   **Sure.**

20   Q.   It wasn't intended to publicly embarrass or do anything

21 specifically regarding Doyle Byrnes, was it?

22   A.   **Quite frankly, those students were not even on the**

23 **radar.**

24   Q.   Okay.  Is there anything about that presentation that

25 would have prevented you from hearing the appeal of Doyle

1    Byrnes and her attorney and keeping an open mind as to all of

2    the information that was presented to you?

3       **A.   Not in my mind.  (Shaking head.)**

4       Q.   Okay.  And, in fact, you did receive at least two

5    submissions, two written submissions, from Ms. Byrnes'

6    attorney, Mr. Cohen?

7       **A.   Yes, I did.**

8       Q.   It was very extensive, it had a lot of suggestions,

9    sample policies, it had a lot of information for you to

10   consider, did it not?

11      **A.   That's correct.**

12      Q.   And he was present when you interviewed Doyle Byrnes?

13      **A.   Yes, he was.**

14      Q.   And you didn't cut her off or prevent her from speaking

15   her mind as to the defense of her in the appeal of the

16   dismissal, did you?

17      **A.   I really tried not to.**

18      Q.   Okay.  And you were open-minded at that point, you

19   hadn't made up your mind, you were willing to listen to any

20   information that she and her attorney would present?

21      **A.   Very correct.**

22      Q.   And during that process you offered, in fact, to assist

23   these students in -- specifically Doyle Byrnes -- in applying

24   for admission to another program if she wanted to leave out of

25   state and stick with her plans?

1      A.   I did indicate I would work with Ms. Walsh to make that

2  happen.

3      Q.   And you indicated to Ms. Byrnes that you would support

4  an application for readmission, you would consider that?

5      A.   That was part of the appeal of Ms. Walsh, yes.

6      Q.   And did Doyle Byrnes appeal your determination of

7  dismissal?

8      A.   No.

9           MR. FERGUSON:  That's all I have.

10          THE COURT:  Mr. Cohen.

11                    CROSS-EXAMINATION

12  BY MR. COHEN:

13     Q.   Dr. Craig, we have your address to the students

14  November 15th on a tape recording, which could be played here.

15  And I want to ask you very specifically about statements that I

16  claim, having listened to your voice, that you made.  "Last

17  week there was inappropriate pictures taken in a clinical

18  setting and they were posted to a social network."

19          Did you make that statement on November 15th in a

20  nursing school lecture hall?

21     A.   I did.

22     Q.   Next did you make the statement, "This is considered to

23  be disruptive behavior to the learning environment and very

24  unprofessional . . . and not what we expect of students in our

25  nursing program"?

1    A.   I did.

2    Q.   Now, don't you realize that the whole point of you

3    serving as an appeal officer is to fairly and impartially

4    determine whether there has been disruptive behavior as

5    alleged, but in this case you'd made that determination on

6    November 15th, long before I was able to advocate for Doyle,

7    long before she was able to file her appeal, and so your

8    service as an appeal officer was a complete sham?  Do you see

9    that?

10   **A.   Actually, I don't, because what I see is that even if I**

11   **do perceive the actions to be unprofessional, that doesn't mean**

12   **that I would support that the discipline that went along with**

13   **that should be upheld, and that was the thing that really was**

14   **being brought to my attention was the discipline related to**

15   **those actions.**

16   Q.   So do we agree then that you had already found the

17   defendant guilty, you just hadn't sentenced her yet?

18   **A.   I'm not sure I would agree totally with that, no.**

19   Q.   Well, you'd already reached the ultimate factual issue,

20   that she was guilty of disruptive behavior, and you reached

21   that conclusion before you considered her appeal?

22   **A.   I do consider posting those pictures to Facebook as**

23   **unprofessional.**

24           MR. COHEN:  Nothing further.  Thank you.

25           THE COURT:  Do you want to introduce the copy of

1    her transcript through this witness, Mr. Cohen?

2              MR. COHEN:  Yes, it's Plaintiff's Exhibit 15, and

3    I offer it in --

4              THE COURT:  Is there a copy of it that she can

5    look at?

6              MR. COHEN:  Yes, it's been provided many days ago

7    to her counsel.  They picked up a copy of the CD a few days

8    ago.

9              THE COURT:  Can you show it to her?

10             Have you seen this document?  Ms. Craig, this

11   transcript?

12             THE WITNESS:  Yes.

13             THE COURT:  Is that a transcript of your

14   statement?

15             THE WITNESS:  Yes.

16             THE COURT:  Do you have any objection to its

17   admission?

18             MR. FERGUSON:  No.

19             THE COURT:  All right.  It's admitted.

20             Do you have any redirect, Mr. Ferguson?

21             MR. FERGUSON:  No.

22             THE COURT:  All right, you may step down.

23             (Witness excused from the witness stand.)

24             MR. FERGUSON:  My next witness would be

25   Dr. Rhinehart, but I'm not sure it's necessary, so maybe

 1    explore there's a stipulation that Ms. Byrnes has not followed

 2    or completed the appeal process and has abandoned prior to

 3    going to Dr. Rhinehart.  If there's no stipulation, then I'll

 4    put her on.

 5                   MR. COHEN:  There's no stipulation to that.

 6                   THE COURT:  Well, the question is has the

 7    plaintiff sought a third level of the appeal with

 8    Dr. Rhinehart.

 9                   MR. COHEN:  As a matter of fact only, she has

10    not --

11                   THE COURT:  Well, witnesses only testify to fact.

12                   MR. COHEN:  Yeah.  She has not sought the appeal

13    with Dr. Rhinehart.  That amount we do stipulate to.

14                   THE COURT:  And so based on that factual

15    stipulation, do we need to hear from Dr. Rhinehart?

16                   MR. FERGUSON:  No.

17                   THE COURT:  All right.  Thank you.  Does that

18    conclude your witnesses?

19                   MR. FERGUSON:  It does, Your Honor.

20                   THE COURT:  Thank you.  Counsel, I read

21    plaintiff's submissions.  And notwithstanding my previously

22    expressed unhappiness with the lateness of defendants' filing,

23    I have read most of them, and have looked through the exhibits

24    and the affidavits as you've produced them up here.

25                   By the way, let's take care of this, Mr. Ferguson.

 1    Which of your exhibits do we need to introduce?

 2              And I'm also -- I neglected, in plaintiff' case,

 3    you had also identified Exhibit 17 in your testimony with your

 4    plaintiff.  I'm going to admit that as well.  Does that really

 5    admit all of your exhibits, besides the recording, which is

 6    probably not necessary?  Which of your exhibits are you

 7    offering?

 8              MR. FERGUSON:  I'm offering Exhibits 400 to 425.

 9              THE COURT:  Did you refer to all of them?  I

10    honestly admit I didn't keep track.

11              MR. FERGUSON:  I did refer to --

12              THE COURT:  Oh, here.  Okay, I understand that you

13    referred to 1 through 7 -- I think we did have 9, 1 through 7,

14    9, I don't think we had 11.  Did we have 11?

15              MR. FERGUSON:  It's referred to in Amber's

16    syllabus.

17              THE COURT:  All right.

18              MR. FERGUSON:  Or, excuse me, in her affidavit.

19              THE COURT:  You referred to the affidavits with

20    the witnesses.

21              MR. FERGUSON:  Okay, 412.

22              THE COURT:  We did not refer to 15.

23              MR. FERGUSON:  That's right.

24              THE COURT:  416.

25              MR. FERGUSON:  Actually 415 and 416 are both

1   referred to in Clarissa Craig's affidavit that was

2   incorporated.

3                THE COURT:  All right.

4                MR. FERGUSON:  418.

5                THE COURT:  All right.  Yeah, I think we've -- all

6   right, I think you may have referred to all of them.  Do you

7   have any objection, Mr. Cohen?

8                MR. FERGUSON:  And then additions.

9                THE COURT:  24 and 25.  I have those.

10                MR. COHEN:  I do not, Your Honor.

11                THE COURT:  I'm going to admit them all.

12                Counsel, I'm not going to ask for closing

13   arguments from you because I've read your briefs and I've even

14   read defendant's brief both prior to and sitting up here, and I

15   don't think I need to hear any more argument, and besides

16   you've not left yourselves time.

17                Let me address some legal issues first.  And as I

18   said, I think I need to rule somewhat today because of the

19   importance of timing.  These may not be in any particular order

20   but I first need to address some legal issues.  The first

21   one -- I don't know why it's first -- is the information that

22   Dr. Day testified to as to whether this is an academic or

23   disciplinary proceeding.  Obviously, the schools are given far

24   greater deference in academic than disciplinary proceedings.

25   And defendants contend that this is an academic proceeding and

Case 2:10-cv-02690-EFM-DJW Document 18 Filed 01/10/11 Page 144 of 159
1-6-11 BYRNES v. JCCC, et al. 10-2690
144

1    clearly it's not. It's academics, defendants say, because it

2    happened in the school context. Well, this whole dichotomy

3    exists within a school context.

4           Academic proceedings relate to you failed the

5    course, the Court's not going to second-guess whether you

6    should have gotten a C instead of an F. This is clearly

7    conduct-related. Even Dr. Day's affidavit itself refers to

8    conduct-related. This is clearly -- whatever it may be in the

9    school setting, in the legal setting it's clearly disciplinary,

10   not academic, and as such the higher standard of review that

11   goes to colleges does not apply here.

12          Secondly, although it's not come up in testimony,

13   defendants argue in their brief that this is seeking not

14   injunctive relief but mandatory behavior or mandatory -- the

15   phrase escapes me but you all know what I mean, which is a

16   much, much higher standard because it seeks to compel the

17   school to do something, as opposed to not doing something, and

18   defendant's correct that requirements compelling someone to

19   take affirmative action as opposed to refrain from action are

20   at a much, much higher standard. But that's not what this is,

21   because it's clear that under the law that injunctive relief

22   says that it's to preserve the status quo, and the status quo

23   is defined as the status of events prior to the occurrence of

24   the events which gave rise to the dispute.

25          So under the legal terms, the status quo in this

 1    instance is that -- well, I guess we only have one plaintiff,

 2    that Doyle Byrnes was a student in Johnson County Nursing

 3    College.  That's the status quo.  And so this is an injunctive

 4    and not a mandatory case because plaintiff is seeking to

 5    preserve the status of the status quo prior to the event.  So

 6    the higher standard that applies in mandatory relief also does

 7    not apply.

 8               Defendant's brief said there's no constitutional

 9    right to post-secondary education and cited no authority.

10    That's clearly wrong.  There are Tenth Circuit cases that hold

11    opposite that in the last ten years or so.  So enough said.

12               Defendants also in their brief claim that

13    sovereign immunity prohibits this court from enforcing civil

14    rights law.  I find that quite an astonishing assertion and

15    summarily reject it.  It's clear that civil rights authority

16    run against state and local entities as well as federal.

17               Defendants claim that failure to exhaust

18    administrative remedies prohibits the plaintiffs from bringing

19    this case.  Again the law is quite to the contrary.  Defendants

20    even make in their brief sort of the astonishing argument that

21    there may be a requirement to exhaust -- this is on page 27 of

22    the defendant's brief -- there may be requirement to exhaust

23    administrative remedies for a state court proceeding, but not

24    here.  So apparently administrative proceedings of community

25    colleges have a higher -- well, I don't understand that.  But

1  clearly, again, the law is clear on these cases and I've

2  researched this issue prior to today.  Exhaustion of these

3  types of administrative remedies are not a requirement, and so

4  that legal argument's rejected.

5        Apparently defendants' argument is no liberty

6  interest cognizable here, but I think it's clear from testimony

7  that plaintiff's reputation and the ability to establish in

8  pursuit of her chosen career, whether in Johnson County or

9  elsewhere, is implicated in these actions and that clearly

10  indicates a constitutional liberty interest, so again I'd

11  reject that.

12        And finally defendants make sort of a half-hearted

13  qualified immunity argument, which I'm also rejecting because

14  to be qualified immunity first it has to be that the defendants

15  claiming qualified immunity are claiming that against civil

16  damages, and that this hearing is for injunctive relief, not

17  for damages.  That may have some appropriateness -- I'm

18  skeptical for reasons I'll show in a second -- to subsequent

19  proceedings, but with respect to an injunctive relief, that

20  does not apply.  Further, to establish qualified immunity, the

21  defendant has to show that the conduct was not objectionably

22  reasonable in light of the established law and, well, I guess

23  that gets to our later issues, I'll get to those.

24        Let me talk about the facts that I have heard and

25  that I find based on the testimony in this case.  The students

1    believed that Ms. Delphia had given them permission to post.

2    There's a lot of useless discussion about whether the comments

3    the students believed Ms. Delphia had said, "Oh, you girls,"

4    was permission to post.  Any reasonable, commonsense -- and

5    even federal judges on every other week get to apply common

6    sense, any reasonable, commonsense interpretation of that

7    statement would be "that's fine with me."

8             Ms. Delphia denies making that statement.  And I

9    find Ms. Delphia's testimony credible, but I don't think it

10   matters because the students believed that she had made the

11   statement.  Pursuant to defendant's request under Rule 615, all

12   witnesses were excluded but all the witnesses testified the

13   same.  They believed Ms. Delphia had been told that "We are

14   going to post this" and that her response, "Oh, you girls,"

15   they took, as would any reasonable, thinking person, as

16   consent.  So I don't necessarily find that Ms. Delphia said

17   that, but I find that the students believed that she said that

18   and that's critical to their behavior and conduct in this case.

19             Again, these findings of fact don't come in any

20   particular, rational order.  I don't give a lot of weight to

21   the letters of apology which defendants, I think, were offering

22   to say they admitted they did something wrong.  I think these

23   fall under the general rule that offers of settlement are not

24   admissible in the trial of the case.  The plaintiffs -- well,

25   the plaintiff and the other students were saying let's see if

1   we can work it out, let's find an accommodation with the

2   school.  They were making, in essence, for these purposes,

3   offers of settlement.  As we all know, that didn't -- wasn't

4   achieved, so under that general rule I'm not finding that the

5   letters from the students, including plaintiff, were an

6   admission that they knew they had done something wrong.

7           A lot of testimony about whether it was a fresh

8   placenta.  I don't know how it makes a difference.  The

9   placenta came from a mother.  Maybe it came from the mother an

10  hour ago, maybe it came from the mother a year ago.  But if the

11  fact that it came from a patient -- which is, I guess, the only

12  place they come from -- is relevant, then it doesn't matter

13  when, so the fact that it was fresh, I think, is irrelevant.

14  Let me come back to this.

15          The photo issue.  It's clear, and Ms. Delphia

16  admitted that she implicitly or actually she has admitted that

17  she gave permission for the photos to be taken.  Here's the

18  thing.  Photos are taken to be viewed.  Let's assume that the

19  plaintiffs had taken a photo of a mother in labor with her name

20  tag visibly on her.  That would have clearly been a violation

21  of patient confidentiality and nursing code of conduct and a

22  hundred other things.  Irrespective of whether that photo was

23  posted on Facebook, shown around at the sorority, photos are

24  taken to be viewed.  And the fact that this photo was viewed on

25  Facebook, as opposed to at the dorm or at the tavern or

1-6-11 BYRNES v. JCCC, et al.  10-2690

149

1   anywhere else, is really irrelevant.  Once permission is given

2   for a photo to be taken, you should assume it's going to be

3   viewed.  That's why people take photos.

4              So the question becomes was this photo clearly a

5   violation of patient confidentiality.  Now, as I said, if the

6   photo were of a patient, of a mother in labor, clearly it would

7   be.  What if the nursing students had taken a photo of a vial

8   of blood?  That also comes from patients.  I don't know where

9   else blood comes from.  What if they'd taken a photo of a vial

10  of blood?  Would anyone have said that violates patient

11  confidentiality?  I don't think so.  So the question in my mind

12  is, from the testimony here, is that more like a vial of blood

13  or is it more like a photo with a patient?  There is no way

14  that any patient confidentiality is violated in these photos.

15  In fact, the students even testified they don't even know who

16  the patient was.  I don't know who the patient was.  I know

17  that they're students at Johnson County Community College

18  nursing program, which is good since they're handling organs.

19  And they may have been showing a picture of a vial of blood, as

20  nursing students, but there's no way that that violates patient

21  confidentiality, because you can't tell who the patient is.

22             Ms. Walsh had an extenuated theory, well, you

23  could trace the photos to the day they were taken and then you

24  could figure out that the nursing school only does clinicals at

25  Olathe medical school, and then you could find out, although I

1   don't know how you could find this out under HIPAA, that only

2   one patient had a cesarean that day at Olathe, and so that

3   patient might -- well, I don't think that's what HIPAA does.

4            And, in fact, here's the thing.  Ms. Delphia, who

5   again I found to be a very credible witness, said you can only

6   take these photos if you remove the things, the names, et

7   cetera, that would violate HIPAA.  And so they were removed,

8   and she permitted the photo to be taken, which means that she

9   concluded that photo did not violate HIPAA.

10           There's no patient confidentiality violated in

11  this photo, in this showing.  I can't see how it violates any

12  patient confidentiality because there's no way, Ms. Walsh's

13  extenuated string of hypotheticals notwithstanding, that any

14  reasonable person, maybe even the mother herself, although I'm

15  highly skeptical, but any other reasonable person could figure

16  out what patient that came from.  It does -- I just don't see,

17  there's been no showing at all how this violates patient

18  confidentiality.

19           Let me talk about the hearings, the procedural due

20  process issue.  I'm not going to make a determination as to

21  whether the college's process comports with procedural due

22  process.  I don't think I have to reach that issue, because

23  there's no way that a fair observer of these hearings can say

24  that they in any way represented a fair hearing for these

25  students by an unbiased arbitrator with a clear statement of

1    what they violated and how.

2            The hearing with Ms. Walsh, I mean, I could tell

3    from Ms. Walsh's testimony, was not really a hearing conducive

4    to hearing the students' side.  And it's clear, and Ms. Walsh

5    admitted, that at some point, at least, the students were shut

6    down.  That's not a fair hearing.  I cannot accept Ms. Craig's

7    testimony that she can stand up in front of the school and say,

8    this is a clear violation of policy and then be the neutral

9    arbitrator.

10            Mr. Cohen nailed it.  It was a rhetorical

11   question.  You tried to get an answer for it too long, it was

12   just rhetorical; she had found guilt and was just deciding on

13   judgment.  There was no neutral process of administrative

14   hearings that in any way, under a judicial, under the laws of

15   this country, comported with procedural due process.  I just

16   can't find that it did.

17            It's clear to me that Ms. Walsh loves her nursing

18   program.  But it's also clear to me that she operated more out

19   of her set of moral standards than she did out of the stated

20   code of conduct that's published by Johnson County Community

21   College.  Like the plaintiff's mother, who is offended by

22   these, Ms. Walsh was offended by them.  I'm kind of an uptight

23   sort of a guy myself sometimes.  I'm not offended by them.  But

24   it's not whether I'm offended by them or whether Ms. Walsh is

25   offended by them or whether Doyle Byrnes' mother is offended by

1  them.  The question is do they violate whichever code on

2  whichever day Johnson County alleged they violated, and I've

3  read through those codes several times since this case was

4  filed, and the way they violated is because they said they were

5  unprofessional.

6          Well, unprofessionalism is in the eye of the

7  beholder, and there are some things that are clearly or at

8  least more obviously unprofessional.  Frankly, as much as I

9  respect Judge Charles Simpson of Western Kentucky, whom I've

10  met, really like, he has a fabulous reputation, I'm not sure

11  but what the comments in the Yoder case bordered on

12  unprofessionalism, and he found they did not.

13          I don't think under the code of conduct that's

14  published, whichever one you want to pick on whichever day,

15  there's a clear showing that these students should have known

16  that it violated the professionalism standard.

17          Ms. Walsh is concerned that it affects her

18  reputation, it affects her school's reputation, it impacts her

19  own moral code, it impacts her relationship with the Olathe

20  Medical Center.  But it's only fair to hold these students to

21  what a fair reading of the code of conduct was, and a fair

22  reading of the code of conduct, not any of these other issues,

23  are what they're required to be held to, and I don't see it.

24  It's not there.  It's unfair to the students to hold them to

25  anything other than the code of conduct, or to interpret

1    professional in the way not that a normal person reading it

2    would, but that certain individuals who might have been

3    offended by it.

4         Defendants also said this is disruptive to the

5    learning environment, and I think defendants' reaction was

6    disruptive to the learning environment.  I'm not really sure

7    how I see that these photos -- you know, this whole Facebook

8    generation thing sorta mystifies me sometimes.  Lots of things

9    are public that didn't used to be public.  But today's

10   generation of students are today's generation of students, and

11   I don't know that this is really disruptive to the learning

12   environment.  I think what was disruptive was the college's

13   response to it.

14        So those are my factual findings.  In light of

15   that, let me look at the requirements that are set forth on an

16   injunction or restraining order, and both sides have addressed

17   this in their briefs.  As has been noted, in order for me to

18   grant a preliminary injunction, I have to find four things:

19   One, I have to find that the movant will suffer irreparable

20   injury unless the injunction issues.  She paid for classes, she

21   neither got credit or refund for, she was expelled from a

22   school that, as I already noted, she has a constitutional

23   interest to be in.  It's unclear that she'll be admitted back

24   into a school.  I found this whole dangling of a carrot, maybe

25   if you do what we want we'll readmit you, to be a little

 1    offensive, frankly, but that be wasn't even dangled for the

 2    plaintiff in this case.

 3              And her fears expressed on the stand, I think, are

 4    very real that, based on what happened here, any medical school

 5    in Virginia or wherever she's moving might also be very

 6    reluctant to admit her.  So clearly the first showing of

 7    irreparable injury I think exists.

 8              Second, there has to be an injunction showing that

 9    it would not be adverse to the public interest.  And this is

10    the one that I think probably comes closest, because I

11    understand the significance and the public interest in not only

12    patient confidentiality but professionalism by our health care

13    providers, and that's where I may disagree with the <u>Yoder</u>

14    decision, my high regard for Judge Simpson notwithstanding, but

15    I don't find it here.

16              I think the public interest is that students in

17    our publicly supported schools, and Johnson County Community

18    College is a publicly supported school, not be held to vague

19    standards that are interpreted in various and unpredictable

20    ways and sometimes it's this code of conduct and sometimes

21    that, and be allowed to be driven from an education program

22    from which they've been admitted, and that's, by the way, the

23    difference from the case that you cited, defendants, with

24    respect to the <u>Phelps</u>.

25              That's a case about not being admitted.  That's an

1    entirely different standard than the one present here.  I think

2    the public interest, the weighing of the standards in the

3    public interest, with giving due deference -- and my mother's a

4    nurse, I have great respect for the requirements of patient

5    confidentiality, but I think the public interest weighing comes

6    down on the side of not holding students who have been

7    admitted, duly admitted, to our publicly funded institutions,

8    holding them to arbitrary and widely varying and unpredictable

9    standards that ultimately hinge on the personal interpretations

10   and feelings of those who are imposing them.

11          The third standard is the proof of the threatened

12   injury outweighs whatever damages the injunction may cause.  I

13   think that's clear.  There's very little evidence of any

14   proposed injury to the defendants to readmit these plaintiffs

15   to the nursing program.  And the injury to -- forgive me, we

16   only have one in this case.  The injury to the plaintiff is --

17   I was confused by the repeated testimony that we did a great

18   favor to the students by giving them a W instead of an F

19   because an F would have been fatal to their nursing program,

20   but expelling them from the program is not?  I didn't follow

21   that.  Clearly, the threatened injury to movant clearly

22   outweighs.

23          And, finally, potential likelihood that the movant

24   will prevail on the merits.  And the defendant argued at length

25   in his brief that that's not likely, that there's very little

1    chance that the plaintiff will prevail on the merits, citing

2    several reasons that I've already dismissed:   Sovereign

3    immunity over civil rights law, requirement to exhaust

4    administrative remedies which don't exist, other issues, and

5    ultimately the qualified immunity issue.   But because there's

6    standing Tenth Circuit law that establishes a constitutional

7    interest in public education, and because the property and

8    liberty interests are clearly established, I think it's highly

9    unlikely that defendants can prevail on their qualified

10   immunity argument, even if we were talking about damages, which

11   we're not in an injunctive hearing.

12            So I think -- I think there's a substantial

13   likelihood that the movant will prevail on the merits in this

14   case.  So I'm granting the injunction.  I'm not requiring the

15   posting of a bond.  The only damages the defendants have shown

16   is that they have to defend this legal action.  That's not the

17   type of damages that bonds are meant to cover.  Bonds are meant

18   to cover potential financial losses separate from the legal

19   action.  I don't really like the American rule that each side

20   bears their own costs, but that's what the law is.  That's not

21   what bonds are meant to cover.  Bonds are meant to cover

22   financial losses that will occur by the imposition of the

23   injunction, and there's not been any showing whatsoever of a

24   financial loss here, so I don't think, even if I were to

25   require a bond, the bond would be zero because there's no

1    finding, no showing of financial loss.

2             I'm going to order as an injunction that the

3    plaintiff be reinstated into the nursing school, that she be

4    allowed to take the exams she was denied to take in the fall

5    semester, that she be readmitted in the spring semester.

6    There's been testimony that this remedy is impossible because

7    the clinical's not being offered.  I can't address that.  It

8    appears to me that the plaintiff did take the clinical, at

9    least until November 11th.  If there's another three or four or

10   two or five weeks of clinical that she was denied, I can't

11   make -- I can't make something happen that's not happening.

12   But to the extent that the plaintiff wants to take the final

13   exams that she was denied, my order is that she be entitled to

14   do so, that she be readmitted to the nursing program for the

15   spring semester, and that no retributive action based on this

16   be taken against her.

17             Mr. Cohen, you're going to draft this order up for

18   me.

19             MR. COHEN:  I'd be happy to.

20             THE COURT:  I'm ordering it, I'm entering it from

21   the bench, so it's effective as of this evening, but we need a

22   written memorialization of what this is, and if you need, I

23   have the best court reporter in the business and she would be

24   happy to provide transcripts.

25             So that's the ruling of the court at ten after

1   five.   Is there anything else that we need to take up?

2                   MR. COHEN:  No, thank you, Your Honor.

3                   THE COURT:  This case is in recess.

4                   (Whereupon, the proceedings were concluded at

5                   5:09 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 9th day of January, 2011.


s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter