IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | |
|---|---|
| DOYLE BYRNES, | ) |
| | ) |
| Plaintiff, | ) District Court |
| vs. | ) Case No. |
| | ) 10-2690 |
| JOHNSON COUNTY COMMUNITY | ) |
| COLLEGE, DR. CLARISSA CRAIG, | ) |
| MS. JEANNE WALSH, MS. AMBER | ) |
| DELPHIA, DR. MARILYN | ) |
| RHINEHART and DR. DENNIS DAY, | ) |
| | ) |
| Defendants. | ) |

TRANSCRIPT OF RULING OF THE COURT

On the 6th day of January, 2011, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE ERIC F. MELGREN, Judge of the United States District Court for the District of Kansas, sitting in Kansas City, commencing at 1:30 p.m. Proceedings recorded by mechanical stenography. Transcript produced by computer.

APPEARANCES:

The plaintiff appeared by and through:
    Mr. Clifford A. Cohen
    Cohen, McNeile & Pappas, P.C.
    4601 College Boulevard
    Suite 200
    Leawood, Kansas  66211

The defendants appeared by and through:
    Mr. Mark A. Ferguson
    and
    Mr. Thomas E. Hammond
    Gates, Shields & Ferguson, P.A.
    10990 Quivira
    Suite 200
    Overland Park, Kansas 66210

1              THE COURT:  Counsel, I'm not going to ask for
2    closing arguments from you because I've read your briefs and
3    I've even read defendant's brief both prior to and sitting up
4    here, and I don't think I need to hear any more argument, and
5    besides you've not left yourselves time.
6              Let me address some legal issues first.  And as I
7    said, I think I need to rule somewhat today because of the
8    importance of timing.  These may not be in any particular order
9    but I first need to address some legal issues.  The first
10   one -- I don't know why it's first -- is the information that
11   Dr. Day testified to as to whether this is an academic or
12   disciplinary proceeding.  Obviously, the schools are given far
13   greater deference in academic than disciplinary proceedings.
14   And defendants contend that this is an academic proceeding and
15   clearly it's not.  It's academics, defendants say, because it
16   happened in the school context.  Well, this whole dichotomy
17   exists within a school context.
18             Academic proceedings relate to you failed the
19   course, the Court's not going to second-guess whether you
20   should have gotten a C instead of an F.  This is clearly
21   conduct-related.  Even Dr. Day's affidavit itself refers to
22   conduct-related.  This is clearly -- whatever it may be in the
23   school setting, in the legal setting it's clearly disciplinary,
24   not academic, and as such the higher standard of review that
25   goes to colleges does not apply here.

```
 1              Secondly, although it's not come up in testimony,
 2   defendants argue in their brief that this is seeking not
 3   injunctive relief but mandatory behavior or mandatory -- the
 4   phrase escapes me but you all know what I mean, which is a
 5   much, much higher standard because it seeks to compel the
 6   school to do something, as opposed to not doing something, and
 7   defendant's correct that requirements compelling someone to
 8   take affirmative action as opposed to refrain from action are
 9   at a much, much higher standard.  But that's not what this is,
10   because it's clear that under the law that injunctive relief
11   says that it's to preserve the status quo, and the status quo
12   is defined as the status of events prior to the occurrence of
13   the events which gave rise to the dispute.
14              So under the legal terms, the status quo in this
15   instance is that -- well, I guess we only have one plaintiff,
16   that Doyle Byrnes was a student in Johnson County Nursing
17   College.  That's the status quo.  And so this is an injunctive
18   and not a mandatory case because plaintiff is seeking to
19   preserve the status of the status quo prior to the event.  So
20   the higher standard that applies in mandatory relief also does
21   not apply.
22              Defendant's brief said there's no constitutional
23   right to post-secondary education and cited no authority.
24   That's clearly wrong.  There are Tenth Circuit cases that hold
25   opposite that in the last ten years or so.  So enough said.
```

1            Defendants also in their brief claim that
2   sovereign immunity prohibits this court from enforcing civil
3   rights law.  I find that quite an astonishing assertion and
4   summarily reject it.  It's clear that civil rights authority
5   run against state and local entities as well as federal.
6            Defendants claim that failure to exhaust
7   administrative remedies prohibits the plaintiffs from bringing
8   this case.  Again the law is quite to the contrary.  Defendants
9   even make in their brief sort of the astonishing argument that
10  there may be a requirement to exhaust -- this is on page 27 of
11  the defendant's brief -- there may be requirement to exhaust
12  administrative remedies for a state court proceeding, but not
13  here.  So apparently administrative proceedings of community
14  colleges have a higher -- well, I don't understand that.  But
15  clearly, again, the law is clear on these cases and I've
16  researched this issue prior to today.  Exhaustion of these
17  types of administrative remedies are not a requirement, and so
18  that legal argument's rejected.
19           Apparently defendants' argument is no liberty
20  interest cognizable here, but I think it's clear from testimony
21  that plaintiff's reputation and the ability to establish in
22  pursuit of her chosen career, whether in Johnson County or
23  elsewhere, is implicated in these actions and that clearly
24  indicates a constitutional liberty interest, so again I'd
25  reject that.

1   And finally defendants make sort of a half-hearted
2   qualified immunity argument, which I'm also rejecting because
3   to be qualified immunity first it has to be that the defendants
4   claiming qualified immunity are claiming that against civil
5   damages, and that this hearing is for injunctive relief, not
6   for damages.  That may have some appropriateness -- I'm
7   skeptical for reasons I'll show in a second -- to subsequent
8   proceedings, but with respect to an injunctive relief, that
9   does not apply.  Further, to establish qualified immunity, the
10  defendant has to show that the conduct was not objectionably
11  reasonable in light of the established law and, well, I guess
12  that gets to our later issues, I'll get to those.
13              Let me talk about the facts that I have heard and
14  that I find based on the testimony in this case.  The students
15  believed that Ms. Delphia had given them permission to post.
16  There's a lot of useless discussion about whether the comments
17  the students believed Ms. Delphia had said, "Oh, you girls,"
18  was permission to post.  Any reasonable, commonsense -- and
19  even federal judges on every other week get to apply common
20  sense, any reasonable, commonsense interpretation of that
21  statement would be "that's fine with me."
22              Ms. Delphia denies making that statement.  And I
23  find Ms. Delphia's testimony credible, but I don't think it
24  matters because the students believed that she had made the
25  statement.  Pursuant to defendant's request under Rule 615, all

1  witnesses were excluded but all the witnesses testified the
2  same.  They believed Ms. Delphia had been told that "We are
3  going to post this" and that her response, "Oh, you girls,"
4  they took, as would any reasonable, thinking person, as
5  consent.  So I don't necessarily find that Ms. Delphia said
6  that, but I find that the students believed that she said that
7  and that's critical to their behavior and conduct in this case.
8           Again, these findings of fact don't come in any
9  particular, rational order.  I don't give a lot of weight to
10 the letters of apology which defendants, I think, were offering
11 to say they admitted they did something wrong.  I think these
12 fall under the general rule that offers of settlement are not
13 admissible in the trial of the case.  The plaintiffs -- well,
14 the plaintiff and the other students were saying let's see if
15 we can work it out, let's find an accommodation with the
16 school.  They were making, in essence, for these purposes,
17 offers of settlement.  As we all know, that didn't -- wasn't
18 achieved, so under that general rule I'm not finding that the
19 letters from the students, including plaintiff, were an
20 admission that they knew they had done something wrong.
21          A lot of testimony about whether it was a fresh
22 placenta.  I don't know how it makes a difference.  The
23 placenta came from a mother.  Maybe it came from the mother an
24 hour ago, maybe it came from the mother a year ago.  But if the
25 fact that it came from a patient -- which is, I guess, the only

1   place they come from -- is relevant, then it doesn't matter
2   when, so the fact that it was fresh, I think, is irrelevant.
3   Let me come back to this.
4           The photo issue.  It's clear, and Ms. Delphia
5   admitted that she implicitly or actually she has admitted that
6   she gave permission for the photos to be taken.  Here's the
7   thing.  Photos are taken to be viewed.  Let's assume that the
8   plaintiffs had taken a photo of a mother in labor with her name
9   tag visibly on her.  That would have clearly been a violation
10  of patient confidentiality and nursing code of conduct and a
11  hundred other things.  Irrespective of whether that photo was
12  posted on Facebook, shown around at the sorority, photos are
13  taken to be viewed.  And the fact that this photo was viewed on
14  Facebook, as opposed to at the dorm or at the tavern or
15  anywhere else, is really irrelevant.  Once permission is given
16  for a photo to be taken, you should assume it's going to be
17  viewed.  That's why people take photos.
18          So the question becomes was this photo clearly a
19  violation of patient confidentiality.  Now, as I said, if the
20  photo were of a patient, of a mother in labor, clearly it would
21  be.  What if the nursing students had taken a photo of a vial
22  of blood?  That also comes from patients.  I don't know where
23  else blood comes from.  What if they'd taken a photo of a vial
24  of blood?  Would anyone have said that violates patient
25  confidentiality?  I don't think so.  So the question in my mind

1  is, from the testimony here, is that more like a vial of blood
2  or is it more like a photo with a patient?  There is no way
3  that any patient confidentiality is violated in these photos.
4  In fact, the students even testified they don't even know who
5  the patient was.  I don't know who the patient was.  I know
6  that they're students at Johnson County Community College
7  nursing program, which is good since they're handling organs.
8  And they may have been showing a picture of a vial of blood, as
9  nursing students, but there's no way that that violates patient
10 confidentiality, because you can't tell who the patient is.
11            Ms. Walsh had an extenuated theory, well, you
12 could trace the photos to the day they were taken and then you
13 could figure out that the nursing school only does clinicals at
14 Olathe medical school, and then you could find out, although I
15 don't know how you could find this out under HIPAA, that only
16 one patient had a cesarean that day at Olathe, and so that
17 patient might -- well, I don't think that's what HIPAA does.
18            And, in fact, here's the thing.  Ms. Delphia, who
19 again I found to be a very credible witness, said you can only
20 take these photos if you remove the things, the names, et
21 cetera, that would violate HIPAA.  And so they were removed,
22 and she permitted the photo to be taken, which means that she
23 concluded that photo did not violate HIPAA.
24            There's no patient confidentiality violated in
25 this photo, in this showing.  I can't see how it violates any

1  patient confidentiality because there's no way, Ms. Walsh's
2  extenuated string of hypotheticals notwithstanding, that any
3  reasonable person, maybe even the mother herself, although I'm
4  highly skeptical, but any other reasonable person could figure
5  out what patient that came from.  It does -- I just don't see,
6  there's been no showing at all how this violates patient
7  confidentiality.
8           Let me talk about the hearings, the procedural due
9  process issue.  I'm not going to make a determination as to
10 whether the college's process comports with procedural due
11 process.  I don't think I have to reach that issue, because
12 there's no way that a fair observer of these hearings can say
13 that they in any way represented a fair hearing for these
14 students by an unbiased arbitrator with a clear statement of
15 what they violated and how.
16          The hearing with Ms. Walsh, I mean, I could tell
17 from Ms. Walsh's testimony, was not really a hearing conducive
18 to hearing the students' side.  And it's clear, and Ms. Walsh
19 admitted, that at some point, at least, the students were shut
20 down.  That's not a fair hearing.  I cannot accept Ms. Craig's
21 testimony that she can stand up in front of the school and say,
22 this is a clear violation of policy and then be the neutral
23 arbitrator.
24          Mr. Cohen nailed it.  It was a rhetorical
25 question.  You tried to get an answer for it too long, it was

1  just rhetorical; she had found guilt and was just deciding on
2  judgment.  There was no neutral process of administrative
3  hearings that in any way, under a judicial, under the laws of
4  this country, comported with procedural due process.  I just
5  can't find that it did.
6             It's clear to me that Ms. Walsh loves her nursing
7  program.  But it's also clear to me that she operated more out
8  of her set of moral standards than she did out of the stated
9  code of conduct that's published by Johnson County Community
10 College.  Like the plaintiff's mother, who is offended by
11 these, Ms. Walsh was offended by them.  I'm kind of an uptight
12 sort of a guy myself sometimes.  I'm not offended by them.  But
13 it's not whether I'm offended by them or whether Ms. Walsh is
14 offended by them or whether Doyle Byrnes' mother is offended by
15 them.  The question is do they violate whichever code on
16 whichever day Johnson County alleged they violated, and I've
17 read through those codes several times since this case was
18 filed, and the way they violated is because they said they were
19 unprofessional.
20            Well, unprofessionalism is in the eye of the
21 beholder, and there are some things that are clearly or at
22 least more obviously unprofessional.  Frankly, as much as I
23 respect Judge Charles Simpson of Western Kentucky, whom I've
24 met, really like, he has a fabulous reputation, I'm not sure
25 but what the comments in the Yoder case bordered on

1   unprofessionalism, and he found they did not.
2              I don't think under the code of conduct that's
3   published, whichever one you want to pick on whichever day,
4   there's a clear showing that these students should have known
5   that it violated the professionalism standard.
6              Ms. Walsh is concerned that it affects her
7   reputation, it affects her school's reputation, it impacts her
8   own moral code, it impacts her relationship with the Olathe
9   Medical Center.  But it's only fair to hold these students to
10  what a fair reading of the code of conduct was, and a fair
11  reading of the code of conduct, not any of these other issues,
12  are what they're required to be held to, and I don't see it.
13  It's not there.  It's unfair to the students to hold them to
14  anything other than the code of conduct, or to interpret
15  professional in the way not that a normal person reading it
16  would, but that certain individuals who might have been
17  offended by it.
18             Defendants also said this is disruptive to the
19  learning environment, and I think defendants' reaction was
20  disruptive to the learning environment.  I'm not really sure
21  how I see that these photos -- you know, this whole Facebook
22  generation thing sorta mystifies me sometimes.  Lots of things
23  are public that didn't used to be public.  But today's
24  generation of students are today's generation of students, and
25  I don't know that this is really disruptive to the learning

```
 1  environment.  I think what was disruptive was the college's
 2  response to it.
 3              So those are my factual findings.  In light of
 4  that, let me look at the requirements that are set forth on an
 5  injunction or restraining order, and both sides have addressed
 6  this in their briefs.  As has been noted, in order for me to
 7  grant a preliminary injunction, I have to find four things:
 8  One, I have to find that the movant will suffer irreparable
 9  injury unless the injunction issues.  She paid for classes, she
10  neither got credit or refund for, she was expelled from a
11  school that, as I already noted, she has a constitutional
12  interest to be in.  It's unclear that she'll be admitted back
13  into a school.  I found this whole dangling of a carrot, maybe
14  if you do what we want we'll readmit you, to be a little
15  offensive, frankly, but that be wasn't even dangled for the
16  plaintiff in this case.
17              And her fears expressed on the stand, I think, are
18  very real that, based on what happened here, any medical school
19  in Virginia or wherever she's moving might also be very
20  reluctant to admit her.  So clearly the first showing of
21  irreparable injury I think exists.
22              Second, there has to be an injunction showing that
23  it would not be adverse to the public interest.  And this is
24  the one that I think probably comes closest, because I
25  understand the significance and the public interest in not only
```

1  patient confidentiality but professionalism by our health care

2  providers, and that's where I may disagree with the Yoder

3  decision, my high regard for Judge Simpson notwithstanding, but

4  I don't find it here.

5              I think the public interest is that students in

6  our publicly supported schools, and Johnson County Community

7  College is a publicly supported school, not be held to vague

8  standards that are interpreted in various and unpredictable

9  ways and sometimes it's this code of conduct and sometimes

10 that, and be allowed to be driven from an education program

11 from which they've been admitted, and that's, by the way, the

12 difference from the case that you cited, defendants, with

13 respect to the Phelps.

14             That's a case about not being admitted.  That's an

15 entirely different standard than the one present here.  I think

16 the public interest, the weighing of the standards in the

17 public interest, with giving due deference -- and my mother's a

18 nurse, I have great respect for the requirements of patient

19 confidentiality, but I think the public interest weighing comes

20 down on the side of not holding students who have been

21 admitted, duly admitted, to our publicly funded institutions,

22 holding them to arbitrary and widely varying and unpredictable

23 standards that ultimately hinge on the personal interpretations

24 and feelings of those who are imposing them.

25             The third standard is the proof of the threatened

1  injury outweighs whatever damages the injunction may cause.  I
2  think that's clear.  There's very little evidence of any
3  proposed injury to the defendants to readmit these plaintiffs
4  to the nursing program.  And the injury to -- forgive me, we
5  only have one in this case.  The injury to the plaintiff is --
6  I was confused by the repeated testimony that we did a great
7  favor to the students by giving them a W instead of an F
8  because an F would have been fatal to their nursing program,
9  but expelling them from the program is not?  I didn't follow
10 that.  Clearly, the threatened injury to movant clearly
11 outweighs.
12            And, finally, potential likelihood that the movant
13 will prevail on the merits.  And the defendant argued at length
14 in his brief that that's not likely, that there's very little
15 chance that the plaintiff will prevail on the merits, citing
16 several reasons that I've already dismissed:  Sovereign
17 immunity over civil rights law, requirement to exhaust
18 administrative remedies which don't exist, other issues, and
19 ultimately the qualified immunity issue.  But because there's
20 standing Tenth Circuit law that establishes a constitutional
21 interest in public education, and because the property and
22 liberty interests are clearly established, I think it's highly
23 unlikely that defendants can prevail on their qualified
24 immunity argument, even if we were talking about damages, which
25 we're not in an injunctive hearing.

```
 1              So I think -- I think there's a substantial
 2   likelihood that the movant will prevail on the merits in this
 3   case.  So I'm granting the injunction.  I'm not requiring the
 4   posting of a bond.  The only damages the defendants have shown
 5   is that they have to defend this legal action.  That's not the
 6   type of damages that bonds are meant to cover.  Bonds are meant
 7   to cover potential financial losses separate from the legal
 8   action.  I don't really like the American rule that each side
 9   bears their own costs, but that's what the law is.  That's not
10   what bonds are meant to cover.  Bonds are meant to cover
11   financial losses that will occur by the imposition of the
12   injunction, and there's not been any showing whatsoever of a
13   financial loss here, so I don't think, even if I were to
14   require a bond, the bond would be zero because there's no
15   finding, no showing of financial loss.
16              I'm going to order as an injunction that the
17   plaintiff be reinstated into the nursing school, that she be
18   allowed to take the exams she was denied to take in the fall
19   semester, that she be readmitted in the spring semester.
20   There's been testimony that this remedy is impossible because
21   the clinical's not being offered.  I can't address that.  It
22   appears to me that the plaintiff did take the clinical, at
23   least until November 11th.  If there's another three or four or
24   two or five weeks of clinical that she was denied, I can't
25   make -- I can't make something happen that's not happening.
```

1    But to the extent that the plaintiff wants to take the final
2    exams that she was denied, my order is that she be entitled to
3    do so, that she be readmitted to the nursing program for the
4    spring semester, and that no retributive action based on this
5    be taken against her.
6              Mr. Cohen, you're going to draft this order up for
7    me.
8              MR. COHEN:  I'd be happy to.
9              THE COURT:  I'm ordering it, I'm entering it from
10   the bench, so it's effective as of this evening, but we need a
11   written memorialization of what this is, and if you need, I
12   have the best court reporter in the business and she would be
13   happy to provide transcripts.
14             So that's the ruling of the court at ten after
15   five.  Is there anything else that we need to take up?
16             MR. COHEN:  No, thank you, Your Honor.
17             THE COURT:  This case is in recess.
18             (Whereupon, the proceedings were concluded at
19             5:09 p.m.)
20
21
22
23
24
25

C E R T I F I C A T E

      I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

      That the above and foregoing proceedings were taken by me at said time and place in stenotype;

      That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

      That I am a disinterested person to the said action.

      IN WITNESS WHEREOF, I hereto set my hand on this the 24th day of January, 2011.

      s/ Johanna L. Wilkinson
      Johanna L. Wilkinson, CSR, CRR, RMR
      United States Court Reporter